UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

D.L., a minor, by and through his next-of-
friends, S.L. and R.L., mother and father of
the minor,

        Plaintiffs,

v.                                     Case No. 8:22-cv-35-JLB-AEP

HERNANDO COUNTY SHERIFF'S
OFFICE, a public entity, AL NIENHUIS, in
his official capacity as Sheriff of Hernando
County, Florida, DEPUTY PAUL SMITH,
School Resource Officer, in his individual
and official capacities, and HERNANDO
COUNTY SCHOOL BOARD, a public entity.

        Defendants.

_____/

## ORDER

       Plaintiff D.L., a minor, has sued Defendants Hernando County Sheriff's

Office ("HCSO"), Sheriff Al Nienhuis ("Sheriff Nienhuis"), Deputy Paul Smith

("Deputy Smith"), and the Hernando County School Board ("HCSB") for Fourth and

Fourteenth Amendment violations as well as violations of Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  (Doc. 1.)  Two separate motions to

dismiss have been filed—one from the HCSO, Sheriff Nienhuis, and Deputy Smith

and one from the HCSB—and D.L. has responded to both.  (Docs. 17, 19, 29, 36.)

Only the first of these two motions to dismiss—that of the HCSO, Sheriff Nienhuis,

and Deputy Smith (collectively "Defendants")—is addressed in this Order.  After

careful review, the Court finds that the HCSO, Sheriff Nienhuis, and Deputy

Smith's Motion to Dismiss (Doc. 17) is **GRANTED IN PART** and **DENIED IN PART**.  D.L. will be afforded an opportunity to amend his Complaint consistent with this order.

## BACKGROUND[1]

D.L. is a child with non-communicative autism, which impedes his ability to "stay[] focused, pay attention, control[] [his] behavior, comply[] with directives, and remain[] seated."  (Doc. 1 at ¶ 28.)  During the 2017–2018 school year, D.L. was enrolled in the fifth grade at the Winding Waters Elementary School ("Winding Waters"), a school in the Hernando County School District.  (Id. at ¶ 27.)  School personnel were aware of D.L.'s autism diagnosis and understood that D.L. required a "behavior intervention plan" in order to "manage his disability-related behaviors." (Id. at ¶ 29.)

On January 10, 2018, while D.L. was in a classroom at Winding Waters, D.L. had an autism-related outburst, wherein he had difficulty "complying with directives from teachers and administrators; controlling his emotions; and controlling his physical conduct."  (Id. at ¶ 30.)  At the time, D.L. was ten years old, stood 4'10" tall, and weighed about ninety pounds.  (Id. at ¶ 27.)  As a result of this outburst, D.L. was removed from the classroom[2] and taken to an office at the school

---

[1] A court must accept a plaintiff's factual allegations as true at the motion-to-dismiss stage.  West v. Warden, 869 F.3d 1289, 1296 (11th Cir. 2017) ("When considering a motion to dismiss, we accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor") (quotation omitted).

[2] D.L. does not specify in his Complaint who removed him from the classroom or who took him to the school office.  (Doc. 1 at ¶ 30.)

where he was "placed in seclusion."[3]  (Id. at ¶ 30.)  After some time in seclusion, D.L. was handcuffed by Deputy Smith and other school personnel and carried out of Winding Waters building.  (Id. at ¶¶ 31–32.)  D.L. was then transported by the HCSO to Spring Brook, a mental health facility in Hernando County, where he was involuntarily committed under the Florida Baker Act.  (Id. at ¶¶ 24, 33.)  D.L. suffered "physical injuries," "emotional distress," and "psychological stress" when he was handcuffed and transported from Winding Waters to Spring Brook.  (Id. at ¶¶ 31–34.)  He continues to suffer "emotional pain, psychological injury, trauma, and suffering" in the aftermath of these events.  (Id. at ¶ 54.)

D.L. now brings four claims against the Defendants arising from his handcuffing and transportation on January 10, 2018.  (Id. at ¶¶ 37–70.)  In Count I, he alleges that Defendants HSCO, Sheriff Nienhuis, in his official capacity, and Deputy Smith, in his individual and official capacities, violated D.L.'s right to be free from unreasonable seizure and excessive force under the Fourth and Fourteenth Amendments of the U.S. Constitution.  (Id. at ¶¶ 37–46.)  And in Count II, D.L. alleges that the HCSO violated his right against disability-based discrimination under the ADA.  (Id. at ¶¶ 47–54.)  The remaining counts pertain exclusively to the HCSB and will not be addressed in this Order.  D.L. seeks

---

[3] "Seclusion" is a term of art defined in the Florida Education Code as "the involuntary confinement of a student in a room or area alone and preventing the student from leaving the room or area.  The term does not include time-out used as a behavior management technique intended to calm a student."  Fla. Stat. § 1003.573(1)(e).

declaratory relief, injunctive relief, compensatory damages, punitive damages, and attorneys' fees and costs for these injuries. (Id. at 21–22.)

Defendants HCSO, Sheriff Nienhuis, and Deputy Smith move to dismiss D.L.'s Complaint under Federal Rule of Civil Procedure 12(b)(6), pointing to ten different theories under which D.L.'s Complaint fails to state a claim. (Doc. 17.) Specifically, they contend: (1) Count I of D.L.'s Complaint is a "quintessential shotgun pleading," (2) the HCSO is not a proper party to the suit, (3) Deputy Paul Smith is improperly sued in both his individual and official capacities, (4) D.L. has failed to properly allege a claim against Sheriff Nienhuis under Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), (5) Deputy Smith is entitled to qualified immunity, (6) D.L. has failed to state a claim under Title II of the ADA, (7) D.L. improperly seeks punitive damages, (8) D.L. cites to and relies on inapplicable statutes throughout his Complaint, (9) the facts as alleged in D.L.'s Complaint do not meet the definition of seclusion or imminent risk of serious injury as defined under Florida law, and (10) D.L. has failed to properly request any sort of injunction. (Doc. 17 at 6–22.) Below, the Court will assess these various theories under which the Defendants argue the claims against them should be dismissed.

## DISCUSSION

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir.

4

1998)).  To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Fed. R. Civ. P. 8(a)(2); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted).

## I.     Count I of D.L.'s Complaint is not a shotgun pleading.

Defendants first argue that Count I of D.L.'s Complaint is a "quintessential shotgun pleading" because it alleges multiple claims against multiple defendants without specifying which claims apply to which defendants.  (Doc. 17 at 6–8.)  D.L. responds that while Count I references multiple defendants, it is not a shotgun pleading because it is clear "which of the Defendants are responsible for which acts" alleged.  (Doc. 19 at 4.)  For the reasons discussed below, the Court agrees with D.L. that Count I is not a shotgun pleading.

The Federal Rules of Civil Procedure provide that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and that each "party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances."  Fed. R. Civ. P. 8(a); Fed. R. Civ. P. 10(b).  Complaints that fail to comply with these rules are sometimes referred to as "shotgun pleadings."  Weiland v. Palm Beach Cnty.

Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015).  The Eleventh Circuit has "repeatedly condemned shotgun pleadings," explaining that shotgun pleadings "fail[] to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."  Embree v. Wyndham Worldwide Corp., 779 F. App'x 658, 662 (11th Cir. 2019).  There are four types of shotgun pleadings, one of which is at issue here: where a count "assert[s] multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  Weiland, 792 F.3d at 1323.  Shotgun pleadings of this variety are defective because "the defendants are left to guess at what Plaintiff's claimed bases of liability are against them and what facts alleged might possibly support them."  Muhammad v. HSBC Bank USA, No. 1:17-CV-00379-SC, 2018 WL 10580410, at *3 (S.D. Ala. Jan. 25, 2018).

Here, Count I does not bear the hallmarks of a shotgun pleading because contrary to the Defendants' contentions, it is clear which claims are asserted against which Defendants.  Count I is a claim for unreasonable seizure and use of excessive force in violation of the Fourth and Fourteenth Amendments brought against three of the Defendants.  (Doc. 1 at ¶¶ 37–46.)  While each of these three Defendants' conduct is collapsed into this single count, it is clear based on the pleading which Defendants are responsible for which of the offending acts.  Paragraph 40, for example, clearly singles out the Defendant School Resource Officer ("SRO"), Deputy Smith, alleging that he "physically restrained [D.L.] and

placed handcuffs on [D.L.] in such a fashion as to cause physical injury to the minor."  (Id. at ¶¶ 39(c), 40.)  Paragraph 43, meanwhile, is aimed squarely at the conduct of Defendant Sheriff Nienhuis, whom D.L. alleges "has failed and continues to fail to train and supervise School Resource Officers" and to "implement policies, practices, and procedures to prevent such unlawful physical restraints."  (Id. at ¶ 43.)  Finally, Paragraph 44 targets the conduct of the HCSO, alleging that it has maintained "an unlawful policy or custom of imposing unreasonable seizures and excessive force on schoolchildren" and "failed to implement training, supervision, policies, practices, and procedures to prevent such unlawful physical restraints." (Id. at ¶ 44.)  Thus, to the extent that D.L.'s Complaint sufficiently alleges different theories of liability for each of the three Defendants implicated in the unreasonable seizure and use of excessive force claim, Defendants' assertion that the Complaint does not specify which of the Defendants are responsible for which acts is incorrect. Accordingly, the Court finds that Count I is not a shotgun pleading, and the Defendant's first basis for dismissal is not a proper grounds to dismiss D.L.'s Complaint.

## II.   The HCSO is due to be dismissed as a party defendant to Count I but not Count II.

Defendants further argue that the HCSO should be dismissed as a party defendant to both Count I (unreasonable seizure and excessive force) and Count II (ADA violations) because it "is not considered a legal entity subject to suit, and has no legal existence separate and apart from the Sheriff of Hernando County, Florida."  (Doc. 17 at 8–9.)  D.L. responds that Title II of the ADA governs public

7

entities, including law enforcement agencies, and accordingly, the HCSO is a proper party to the count alleging disability-based discrimination under this Act.  (Doc. 19 at 4–5.)  For the reasons described below, the Court finds that the HCSO should be dismissed from Count I, but it should <u>not</u> be dismissed from Count II.

### a. The HCSO is not a proper party defendant to D.L.'s section 1983 excessive force claim.

A government entity may be sued for violations of constitutional rights under section 1983 so long as the violation bears some relation to the entity's "policies or established customs."  <u>Monell</u>, 436 U.S. at 708 (Powell, J., concurring).  Whether a particular entity is the correct party in interest varies significantly from state to state.  <u>See</u> <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 123 (1988).  In Florida, the proper party in interest in cases involving the unconstitutional conduct of police departments, is the city or municipal corporation to which the police department belongs.  <u>See</u> <u>Eddy v. City of Miami</u>, 715 F. Supp. 1553, 1556 (S.D. Fla. 1989) (holding that "[w]here a police department is an integral part of the city government as the vehicle through which the city government fulfills its policing functions, it is not an entity subject to suit").

In fact, Florida state courts have found that in the context of section 1983 claims, city police departments are not legal entities and have no legal existence distinct from that of the city.  <u>Cotton v. Polk Cnty. Sheriff's Off.</u>, No. 8:05-cv-1608-T17-TGW, 2005 WL 2179768, at *2 (M.D. Fla. Sept. 8, 2005) (citing <u>Fla. City Police Dept. v. Corcoran</u>, 661 So.2d 409, 410 (Fla. 3d DCA 1995)).  A sheriff's office is also not a legal entity subject to suit under § 1983.  <u>See</u> <u>Faulker v. Monroe Cnty.</u>

8

Sheriff's Dep't, 523 F. App'x 696, 701 (11th Cir. 2013) (finding that Florida law has not established Sheriff's offices as separate legal entities with the capacity to be sued and affirming dismissal of a county sheriff's office).

Here, Count I is a claim for constitutional violations brought against the Defendants under section 1983.  (Doc. 1 at ¶¶ 37–46.)  D.L.'s claim against the HCSO is a classic <u>Monell</u> claim in that it argues that the allegedly unconstitutional actions were caused, in part, by the HCSO's "policy or custom of imposing unreasonable seizures and excessive force on schoolchildren."  (<u>Id.</u> at ¶ 44.)  Accordingly, the HCSO should be dismissed as a party defendant to Count I.

**b.  The HCSO is a proper party defendant to D.L.'s ADA claim.**

The ADA was enacted by Congress "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  Title II of the ADA specifically targets public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Congress has explicitly provided that a "public entity" for the purposes of ADA coverage includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  42 U.S.C. § 12131(1); <u>see also</u> 28 C.F.R. § 35.104 (defining "public entity" as, among other things, an "instrumentality of a State or States or local government").  A county law

enforcement department is a public entity and thus a proper party to a claim for disability-based discrimination brought under Title II of the ADA.  See <u>Bircoll v. Miami-Dade Cnty.</u>, 480 F.3d 1072, 1084 (11th Cir. 2007) (explaining that the plaintiff "could still attempt to show an ADA claim under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability."").

Count II in D.L.'s Complaint alleges that the HCSO violated the ADA "[t]hrough its policy and practice of imposing unnecessary and excessive physical force and physical restraints including handcuffs, on schoolchildren with disabilities."  (Doc. 1 at ¶ 51.)  The HCSO is a public entity, and therefore is subject to claims brought under Title II of the ADA.  As a result, the HCSO is not due to be dismissed from Count II of D.L.'s Complaint.

### III.   The claims against Deputy Smith are not due to be dismissed because D.L. has adequately established that Deputy Smith is not entitled to qualified immunity.

Defendants next request that the Court dismiss the claims against Deputy Smith because D.L. has failed to "explicitly identify the capacity in which Defendant Deputy Paul Smith is being sued."  (Doc. 17 at 9.)  D.L. responds that he agrees with the Defendants that Deputy Smith should not be sued in his official capacity. (Doc. 19 at 6.)  Instead, D.L. seeks to sue Deputy Smith solely in his individual capacity.  (<u>Id.</u>)  Accordingly, the claims against Deputy Smith in his official capacity are due to be dismissed, and the Court will not address them further.

The Defendants also argue that the claims against Deputy Smith in his individual capacity in Count I of D.L.'s Complaint should be dismissed because Deputy Smith has qualified immunity.  (Doc. 17 at 13–15.)  D.L. responds that Deputy Smith is not entitled to qualified immunity because his conduct was objectively unreasonable and a clear violation of D.L.'s Fourth Amendment rights.  (Doc. 19 at 8–13.)  Accepting D.L.'s allegations as true, the Court finds, for the reasons below, that granting Deputy Smith qualified immunity without further factfinding would be premature.  Therefore, the Court declines to grant Deputy Smith qualified immunity.  Deputy Smith is free to raise the issue of qualified immunity again at the summary judgment stage should he desire.

### A. Deputy Smith was acting within the scope of his discretionary authority during the alleged conduct giving rise to D.L.'s claims.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  To invoke qualified immunity, the officer must first establish that he was acting within the scope of his discretionary authority.  Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008).  "The term discretionary authority covers all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority."  Hinson v. Bias, 927 F.3d 1103, 1116 (11th Cir. 2019).  If the officer can establish that his discretionary duties included the conduct alleged in the

Complaint, he can establish that he was acting within the scope of his discretionary authority.  Harbert Intern., Inc. v. James, 157 F.3d 1271, 1282–83 (11th Cir. 1998).

Here, D.L.'s Complaint alleges that SROs are law enforcement officers employed by the HCSO and stationed in Hernando County School District schools based on an agreement between the HCSO and the Hernando County School District.  (Doc. 1 at ¶¶ 18, 21.)  D.L. concedes that Deputy Smith was acting in his capacity as an SRO when he placed handcuffs on D.L. and helped to remove him from the school after D.L. exhibited difficulty "controlling his emotions" and "controlling his physical conduct."  (Id. at ¶¶ 30–32; see also id. at ¶ 18 ("At all time [sic] relevant to this [C]omplaint, Defendant Smith was acting under color of state law.").)  Deputy Smith therefore acted within his discretionary authority because his duties as an SRO included policing the behavior of students in the manner described by D.L.  See Ziegler v. Martin Cnty. Sch. Dist., 831 F.3d 1309, 1316 n.3 (11th Cir. 2016) (observing that an arrangement between a Florida county sheriff's office and a Florida county school board entailed placing deputy sheriffs in public schools as SROs to "assist in the prevention of juvenile delinquency" and finding that an SRO's search of a party bus was performed within that discretionary authority).

Because the Defendants have established that Deputy Smith "was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred," "the burden then shifts to the plaintiff to establish that qualified immunity is not appropriate."  Kesinger ex rel. Estate of Kesinger v. Herrington,

381 F.3d 1243, 1248 (11th Cir. 2004).  To this end, the Supreme Court has set forth a two-part test to determine whether qualified immunity is appropriate.  Hope v. Pelzer, 536 U.S. 730, 736 (2002).  "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation."  Id.  Even if a defendant did participate in "constitutionally impermissible conduct, [he] may nevertheless be shielded from liability for civil damages if [his] actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Id. at 739 (quotation omitted).  Accordingly, the Court will first determine whether Deputy Smuth's conduct, particularly his use of handcuffs., violated D.L.'s constitutional rights.

**B. D.L.'s allegations establish a constitutional violation.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const., amend. IV.  Courts "must be careful to evaluate the reasonableness of an officer's conduct on a case-by-case basis from the perspective of a reasonable officer on the scene."  Penley v. Eslinger, 605 F.3d 843, 850 (11th Cir. 2010) (quotation omitted).  "[T]o determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand."  Id.  (quotation omitted).  Courts may not assess the situation "with the 20/20 vision

of hindsight." <u>Post v. City of Fort Lauderdale</u>, 7 F.3d 1552, 1559 (11th Cir. 1993) (quotation omitted).

The Supreme Court has long acknowledged that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (11th Cir. 2002).  In order to determine whether the force used in such a seizure is reasonable, the Court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." <u>Tennessee v. Garner</u>, 105 S.Ct. 1694, 1699 (1985).  In <u>Graham</u>, the Supreme Court outlined a number of factors that Courts are to take into account in this balancing test, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396.

Here, accepting D.L.'s allegations as true, the <u>Graham</u> factors weigh in favor of D.L. as to the force used during the child's handcuffing and transportation from the school to a psychiatric facility.  While D.L. admits that he experienced difficulty "complying with directives from teachers and administrators; controlling his emotions; and, controlling his physical conduct," mere disruptive behavior is not a severe offense.  (Doc. 1 at ¶ 30); <u>see</u> <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002) (holding that plaintiff's disorderly conduct and obstruction offenses "were of minor severity" and finding that because "more force is appropriate for a more

serious offenses and less force is appropriate for a  less serious one," the <u>Graham</u> factors "weigh[ed] heavily in plaintiff's favor as to the force" used by the officer).

Next, there is no indication that D.L. was posing a threat to Deputy Smith or any others.  D.L., at the time he was placed in handcuffs, was a ninety-pound, unarmed, ten-year-old.  He was isolated, away from his classmates, in a school office where he was under the supervision of Deputy Smith and other school personnel.  (Doc. 1 at ¶ 31); <u>see Jean-Baptiste on behalf of Jean-Baptist v. Jones</u>, 424 F. Supp. 3d 1251, 1256 (S.D. Fla. 2019) (explaining that the plaintiff "posed no immediate threat to the officers' safety" because he "was a thirteen-year-old who stood just four feet, eleven inches tall and weighed seventy pounds," "he had no weapon," and "he was inarguably confined, without egress, to the center aisle of a school bus.")

Finally, according to D.L.'s account of the events, there is no indication that he actively resisted the efforts of Deputy Smith or any of the other school personnel to subdue him once he was confined in the school office.  But even if D.L had resisted, given his age and size, such resistance still may not have justified the forcefulness with which Deputy Smith handcuffed and transported D.L. to the psychiatric facility.  (Doc. 1 at ¶¶ 31–32); <u>see Borrero v. Metro-Dade Cnty.</u>, 19 F. Supp. 2d 1310, 1314 (S.D. Fla. 1998) (holding that "[a]lthough the child was fleeing from the officer, this alone did not entitle [the officer] to have used the force he did" and that the officer's conduct in response to the plaintiff's fleeing was "perhaps more egregious" than other, factually similar excessive force cases "given the

plaintiff's young age and small size").  Such forcefulness—namely, D.L. being "physically man-handled" and "carried out of the school by multiple deputies" while he was "in handcuffs and unable to walk"—ultimately injured D.L, causing him "physical pain, physical injury and significant emotional distress."  (Doc. 1 at ¶¶ 31–32, 36.)

Courts around the country have found that an arrestee's age is also an important consideration in terms of the reasonableness of an officer's decision to use handcuffs.  The Eleventh Circuit, for example, denied qualified immunity to a school resource officer who handcuffed a nine-year-old student for five minutes, holding that "handcuffing was excessively intrusive given [the arrestee's] young age."  Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir. 2006).  In a case where officers handcuffed an eleven-year-old child, the Ninth Circuit held that the officers used excessive force because the child "was cooperative and unarmed and, most importantly, he was eleven years old."  Tekle v. United States, 511 F.3d 839, 846 (9th Cir. 2007).  And in a case where a ten-year-old girl was placed in handcuffs during an arrest, the Fourth Circuit determined that she fell "squarely within the tender age range for which the use of handcuffs is excessive absent exceptional circumstances."  E.W. by and through T.W. v. Dolgos, 884 F.3d 172, 182 (4th Cir. 2018).  Several district courts have also concluded that an arrestee's young age is an important consideration under the Graham factors and that handcuffing a small child supports a finding of excessive force.  See, e.g., James v. Frederick Cnty.

16

Pub. Sch., 441 F. Supp. 2d 755, 757–59 (D. Md. 2006); Hoskins v. Cumberland Cnty. Bd. of Edu., No. 2:13-15, 2014 WL 7238621, at *7, 11 (M.D. Tenn. Dec. 17, 2014).

Based on D.L.'s account of the facts, therefore, the Graham factors weigh heavily in favor of D.L., particularly when considering his vulnerable age. Accordingly, the Court concludes that D.L. has plausibly alleged that Deputy Smith's isolating D.L. in a school office, handcuffing him, carrying him out of the school and into a patrol car, and transporting him to a psychiatric facility while handcuffed, constituted unreasonable and excessive force in violation of D.L.'s constitutional rights under the Fourth Amendment.

### C. As alleged, D.L.'s constitutional rights were clearly established at the time they were violated.

Because Deputy Smith's alleged conduct violated a constitutional right, the Court must next turn to whether that constitutional right was "clearly established" at the time it was violated.  The question here is "whether the state of the law . . . gave [Deputy Smith] fair warning that [his] alleged treatment of [D.L.] was unconstitutional." Hope, 536 U.S. at 741.  Here, the conduct in question is "not so egregious as to violate . . . the Fourth Amendment on its face," because "the typical arrest involves some force and injury."  Vinyard, 311 F.3d at 1351; Rodriguez v. Farrell, 280 F.3d 1341, 1353 (11th Cir. 2002).  Thus, the Court must look at the relevant case law, specifically to cases "in which the Supreme Court or [the Eleventh Circuit], or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z circumstances.'"  Vinyard, 311 F.3d at 1351.  What is most important in this inquiry is that "contours" of the constitutional right in question

"must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

The case that is most on point here is Gray ex rel. Alexander v. Bostic, discussed in brief above. 458 F.3d 1295. There, a student who was misbehaving in gym class was confronted by a deputy sheriff who was serving as a school resource officer. Id. at 1301. The deputy sheriff escorted the student out of the class and into a lobby area where he handcuffed the student's hands behind her back and tightened the handcuffs to the point that he caused the student pain. Id. The coaches who were teaching the gym class later stated that they were "[n]ever afraid that [the student] would commit an act of violence towards" them or towards another student and that the student's conduct "wasn't that major." Id. at 1302.

The Eleventh Circuit held that the deputy's conduct was an "obvious violation" of the student's Fourth Amendment rights. Id. at 1307. Critical to the court's analysis was that the child was not resisting and did not pose a threat to the deputy sheriff or to anyone else.[4] Id. at 1306. As the court explained, while the use

---

[4] The threat posed by the student as well as the student's likelihood to evade apprehension appear to be essential factors to the courts in the Eleventh Circuit's analyses of excessive force cases, including in the school context. For example, in a case wherein a school resource officer sprayed mace, a chemical irritant, on a student, the court found the officer was not entitled to qualified immunity because "he used force after the resistance and flight risk was over." J.W. ex rel. Williams v. Roper, 541 F. App'x. 937, 942–43 (11th Cir. 2013). And in a case where an officer slammed a student against a car in order to frisk him for weapons, the court found that because the student "was complying with [the officer]'s order to exit his vehicle, had not reached into his pockets or made any furtive movements, was not attempting to flee, and was not otherwise resisting [the officer]'s investigation[,]" the student did not "pose[] an immediate threat" and the officer's use of force was

of handcuffs during an investigatory stop of a child is not always unreasonable, "[e]very reasonable officer would have known that handcuffing a compliant nine-year-old for purely punitive purposes is unreasonable."  Id.  Accordingly, the deputy sheriff was not entitled to qualified immunity.  Id.

Gray ex rel. Alexander stands for the proposition that school resource officers should not handcuff young students who may have committed minor offenses but who do not pose an immediate threat to other students' safety and will not evade arrest.  Gray ex rel. Alexander, 458 F.3d at 1306.  While Gray ex rel. Alexander is not perfectly analogous to this case, perfection is not the standard.  See E.W. v. Dolgos, 884 F.3d 172, 185 (4th Cir. 2018) ("It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the constitutional premise in question.")

The opinion in Gray ex rel. Alexander, which involves materially similar facts to the case at hand, put SROs on notice and gave Deputy Smith a clear warning that handcuffing a small child who was neither resisting arrest nor posing a substantial threat to others violated the child's Fourth Amendment rights. Accepting D.L.'s version of the events as true, Deputy Smith's aggressive handcuffing and carrying of D.L. constitutes a violation of D.L.'s Fourth Amendment rights.  While more factfinding will elucidate the circumstances

---

excessive.  M.D. ex rel. Daniels v. Smith, 504 F. Supp. 2d 1238, 1249 (M.D. Ala. Aug. 27, 2007).

surrounding Deputy Smith's conduct, D.L. has plausibly alleged that a reasonable officer would have known that handcuffing a non-threatening ten-year-old is an excessive use of force.  Accordingly, the Court will not dismiss the claims against Deputy Smith under the shield of qualified immunity at this time.

## IV.   The Section 1983 claims against Sheriff Nienhuis are due to be dismissed.

The Defendants also argue that the claims against Sheriff Nienhuis in Count I should be dismissed because D.L. has not properly established Sheriff Nienhuis's section 1983 liability under Monell.  (Doc. 17 at 10–13.)  D.L. responds that his Complaint is sufficient to state Monell claims against Sheriff Nienhuis based on the HCSO's policy or custom of using handcuffs on schoolchildren as well as the Sheriff's failure to properly train and supervise his officers in the administration of that policy.  (Doc. 19 at 8.)  The Court agrees with the Defendants for the reasons outlined below.

Under Monell, a local official sued in his official capacity may be held liable under section 1983 for the conduct of one of his subordinates where that official's "edicts or acts may fairly be said to represent official policy."  Monell, 436 U.S. at 694.  For example, where a county sheriff promulgated a particular county law enforcement policy and "was acting as the final decisionmaker for the county," the sheriff was found to be subject to liability under section 1983 where that policy led to the violation of citizens' constitutional rights.  Pembaur v. City of Cincinnati, 475 U.S. 469, 485 (1986).  As Justice White noted in concurrence, because the Sheriff, "chose a course that was not forbidden by any applicable law, a choice that [he] then

20

had the authority to make," this course was the official policy.  Id. at 486–87.
"[P]roof that a municipality's legislative body or authorized decisionmaker has
intentionally deprived a plaintiff of a federally protected right necessarily
establishes that the municipality acted culpably."  Board of Cnty. Com'rs of Bryan
County, Okl. v. Brown, 520 U.S. 397, 405 (1997).  Furthermore, "the conclusion that
the action taken or directed by the municipality or its authorized decisionmaker
itself violates federal law will also determine that the municipal action was the
moving force behind the injury of which the plaintiff complains."  Id.

Here, D.L.'s Complaint alleges that Sheriff Nienhuis has (1) failed to
adequately train and supervise school resource officers regarding the use of physical
restraints on elementary school children, and (2) failed to implement policies,
practices, and procedures regarding the use of physical restraints on students with
disabilities.  (Doc. 1 at ¶¶ 22, 43–44.)  The Court will address these two alleged
failures in turn below.

### A. Sheriff Nienhuis is not liable under Monell for failure to properly train and supervise his officers.

As to the first of Sheriff Nienhuis's alleged failures, the Supreme Court has
explained that failure to train, on its own, gives rise to liability under Monell only
under limited circumstances.  City of Canton, Ohio v. Harris, 489 U.S. 378, 388
(1989).  "[T]he inadequacy of police training may serve as the basis for § 1983
liability only where the failure to train amounts to deliberate indifference to the
rights of persons with whom the police come into contact."  Id.  That is, liability may
be found exclusively where the police department's failure to train its officers

constitutes a deliberate or conscious choice by the department.  Id. at 388–89.

Because a municipal entity will almost never have an express policy of inadequately

training or supervising its employees, "a plaintiff must present some evidence that

the municipality knew of a need to train and/or supervise in a particular area and

the municipality made a deliberate choice not to take any action."  Gold v. City of

Miami, 151 F.3d 1346, 1350 (11th Cir. 1998).  Without proof that the municipal

entity was aware of a prior incident in which constitutional rights were similarly

violated, liability for failure to train will not be found.  See Board of Cnty. Com'rs of

Bryan County, Okl., 520 U.S. at 407 (Municipal decisionmakers "continued

adherence to an approach that they know or should know has failed to prevent

tortious conduct by employees may establish the conscious disregard for the

consequences of their action—the deliberate indifference—necessary to trigger

municipal liability.")  The Supreme Court in Canton looked to deadly force training

as an example, holding that:

> [C]ity policymakers know to a moral certainty that their police officers
> will be required to arrest fleeing felons.  The city has armed its officers
> with firearms, in part to allow them to accomplish this task.  Thus, the
> need to train officers in the constitutional limitations on the use of
> deadly force ... can be said to be "so obvious," that failure to do so could
> properly be characterized as "deliberate indifference" to constitutional
> rights.

489 U.S. at 390 n.10.

Subsequent courts have extended this rationale to other contexts.  See

e.g., Waller v. City of Middletown, 89 F. Supp. 3d 279, 285 (D. Conn. 2015) (training

on searches inside a residence); Chamberlain v. City of White Plains, 986 F. Supp.

2d 363, 392-93 (S.D.N.Y.2013) (training on dealing with emotionally disturbed persons).  In general though, "[i]n order for a plaintiff to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice." McDowell v. Brown, 392 F.3d 1283, 1290 (11th Cir. 2004) (quotation omitted).

Here, D.L. has presented no evidence of prior constitutional violations involving the use of physical restraints by the HCSO on schoolchildren with disabilities.  D.L. has also not drawn the Court's attention to a single prior incident in which an SRO employed by the HCSO caused an injury by handcuffing a child using excessive force.  Accordingly, because D.L. has failed to show any previous violations of a disabled student's constitutional rights by the HCSO's officers, the Court finds that D.L. has not established that Sheriff Nienhuis is liable under Monell for a failure to properly train and supervise his officers.

### B. Sheriff Neinhuis is not liable under Monell for implementing or executing an official policy related to the use of handcuffs on disabled schoolchildren.

D.L. has also failed to establish that Sheriff Nienhuis is liable under Monell for implementing or executing an official HCSO policy of using handcuffs on disabled schoolchildren.  As D.L. concedes in his Response, under Monell, "a governmental entity may be held liable for the actions of an employee only when an 'official policy' causes a constitutional violation."  (Doc. 19 at 7); Monell, 436 U.S. at 692.  More specifically, it is only when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an

entity is responsible under § 1983." 436 U.S. at 694.  The policy in question may not be "nebulous" or "removed from the constitutional violation."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 822 (1985).  Rather, a policy "generally implies a course of action consciously chosen from among various alternatives."  Id. at 823.

Thus, inferring a municipal entity's policy from a single incident or inferring that such a policy caused that single incident is insufficient to impose liability under Monell.  Id. at 823–24; Doe v. School Board of Broward Cnty., Fla., 604 F.3d 1248, 1266 (11th Cir. 2010) (finding that two instances of sexual harassment or abuse did not establish custom of inaction).  Broadly speaking, "[o]ne or two incidents of abuse is generally insufficient to indicate a pattern."  Williams v. Fulton Cnty. School Dist., 181 F. Supp. 3d 1089, 1122 (N.D. Ga. March 31, 2016).

That is precisely the inference that D.L. has made here by arguing that the HCSO has a policy of using handcuffs on disabled schoolchildren and that this policy caused D.L.'s injuries.  (Doc. 1 at ¶ 44.)  Not only has D.L. failed to argue that Sheriff Nienhuis chose this policy or had the authority to choose this policy, but he has also provided no evidence that such a policy even exists in the HCSO.  Because D.L. has alleged only a single, isolated incident in which the HCSO's policy of handcuffing disabled schoolchildren was implemented by an SRO, D.L. has failed to establish that the allegedly unconstitutional conduct was officially adopted or promulgated by Sheriff Nienhuis or the HCSO.  Accordingly, because D.L. has failed to show that Sheriff Nienhuis is liable under Monell for the HCSO's alleged official

policies, the section 1983 claims brought against Sheriff Nienhuis in his official capacity in Count I are due to be dismissed with leave to amend.

## V.   D.L. adequately states a claim under Title II of the ADA.

Defendants next argue that D.L. has failed to establish a claim under Title II of the ADA because he has not sufficiently alleged how Defendants discriminated against him by reason of a disability covered by the ADA.  (Doc. 17 at 17.)  D.L. asserts that the HCSO's practices of using handcuffs on schoolchildren is discriminatory because it disproportionately impacts students with disabilities involving behavioral challenges who are particularly vulnerable to physical restraint.  (Doc. 1 at ¶ 49.)  D.L. further contends that the HCSO's use of handcuffs on schoolchildren is a violation of the ADA because such use fails to provide "reasonable modifications" to schoolchildren with disabilities, including D.L.  (Id. at ¶ 52.)  For the reasons discussed below, the Court finds that D.L. has stated a claim against the HCSO under Title II of the ADA.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Department of Justice ("DOJ") has promulgated regulations implementing Title II's prohibition against discrimination, providing that public entities may not "utilize criteria or methods of administration," which "have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(3)(i).

The DOJ's regulations also mandate that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." Id. at § 35.130(b)(7)(i).

To establish a claim of disability discrimination under Title II of the ADA, a plaintiff must show that (1) he is a qualified individual with a disability; (2) he was either "excluded from participation in or denied the benefits of a public entity's services, programs, or activities" or was "otherwise discriminated against by a public entity"; and (3) the discrimination was on the basis of his disability. Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1083 (11th Cir. 2007).

**A. D.L. is a qualified individual with a disability.**

First, the Court must determine whether D.L. is a qualified individual with a disability under the ADA. The Defendants do not appear to dispute that D.L. has a disability. See (Doc. 17 at 17–18.) "The term 'disability' means, with respect to an individual . . . a physical or mental impairment that substantially limits one or more major life activities of such individual.'" 42 U.S.C. § 12102(1)(A). The ADA defines "major life activities" as including, among other things, "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). D.L. is a "disabled" person because he was diagnosed with non-communicative autism, a "mental disorder," which causes him to have "difficulty staying focused, paying attention, controlling behavior, complying with directives, and remaining seated." (Doc. 1 at ¶ 28.) Accordingly, he is a qualified individual under the ADA.

**B. The HCSO is a public entity.**

Next, the Court must determine whether the HCSO constitutes a public entity within the meaning of Title II of the ADA.  A public entity includes the departments, agencies, special purpose districts, and other instrumentalities of state and local governments.  42 U.S.C. § 12131(1)(B).  The Eleventh Circuit has explained that the term "public entity" in Title II "is a catch-all phrase" and "protects qualified individuals with a disability from being subjected to discrimination by any such entity and is not tied directly to the services, programs, or activities of the public entity."  Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist., 133 F.3d 816, 821–22 (11th Cir. 1998).  Accordingly, a plaintiff can bring an ADA claim "under the final clause in the Title II statute: that he was 'subjected to discrimination' by a public entity, the police, by reason of his disability."  Bircoll, 480 F.3d at 1084.  This is precisely the claim brought by D.L. against the HCSO.  (See Doc. 1 at ¶¶ 47–54.)  Accordingly, D.L. has adequately alleged that the HCSO is a public entity under Title II of the ADA.

**C. D.L. has adequately alleged that the HCSO's policy of handcuffing students has the effect of subjecting students with disabilities to discrimination on the basis of disability.**

Last, the Court determines whether D.L. was denied the benefit of the HCSO's services, programs, or activities, or discriminated against by the HCSO, when he was handcuffed and transported to a psychiatric institution.  Regulations implementing provisions of Title II provide that, "[a] public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of

administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability."  28 C.F.R. § 35.130(b)(3)(i). As the language of the Regulations makes clear, "[c]ertainly intentional discrimination is banned by Title II.  But further, actions that have the <u>effect</u> of discriminating against individuals with disabilities likewise violate the ADA." <u>Concerned Parents to Save Dreher Park Center v. City of West Palm Beach</u>, 846 F. Supp. 986, 991 (S.D. Fla. March 1, 1994).

As was stated above, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  While the Eleventh Circuit has not weighed in explicitly as to whether an arrest constitutes a "service, program or activity" for the purposes of the ADA, other

28

circuits have held that both an arrest[5] and the transportation of an arrestee[6] are "services" provided by law enforcement agencies and therefore within the scope of the ADA.

That said, because section 12132 of the ADA is phrased in the alternative, courts need not determine that an arrest constitutes a service.  Bircoll, 480 F.3d at 1084.  Instead, "[p]olice conduct during an arrest of a disabled person is within the parameters of the ADA so long as the plaintiff was subjected to discrimination."  Friedson v. Shoar, 479 F. Supp. 3d 1255, 1263 (M.D. Fla. 2020) (quotation omitted).

---

[5] Holding that "a broad rule categorically excluding arrests from the scope of Title II . . . is not the law," the Tenth Circuit found that arrestees can, in most cases, state a claim under the ADA based on police conduct during an arrest.  Gohier v. Enright, 186 F.3d 1216, 1221 (10th Cir. 1999).  The Ninth Circuit determined that Title II of the ADA applies to arrests in a case where a mentally ill person was injured while she was arrested by police who she alleged did not take her mental illness into account and did not employ "tactics that would have been likely to resolve the situation without injury to herself or others."  Sheehan v. City and Cnty. of San Francisco, 743 F.3d 1211, 1232–33 (9th Cir. 2014), rev'd in part on other grounds sub nom. City and Cnty. of San Francisco, Calif. v. Sheehan, 575 U.S. 600 (2015).  Finally, the Third Circuit held that Title II of the ADA applies to arrests because "[t]he text of the ADA is deliberately broad" and "persuasive precedent indicates that the ADA's references to the services, programs, and activities of a public entity should likewise be interpreted broadly to encompass virtually everything that a public entity does."  Haberle v. Troxell, 885 F.3d 170, 178–80 (3d Cir. 2018) (quotations and brackets omitted).

[6] In a case involving police officers who arrested a mentally ill person and took him to a mental hospital, the Fifth Circuit reasoned that "[o]nce the area was secure and there was no threat to human safety . . . deputies would have been under a duty to reasonably accommodate [the mentally ill person]'s disability in handling and transporting him to a mental heath facility."  Hainze v. Richards, 207 F.3d 795, 802 (5th Cir. 2000).  The Eighth Circuit has also held that "[t]ransportation of an arrestee to the station house is . . . a service of the police within the meaning of the ADA," and the "benefit" sought by an arrestee is "to be handled and transported in a safe and appropriate manner consistent with his disability."  Gorman v. Bartch, 152 F.3d 907, 912–13 (8th Cir. 1998).

Here, D.L. identifies his handcuffing as the point at which the HCSO subjected him to discrimination by reason of his non-communicative autism.  (Doc. 1 at ¶ 49.)  While the Complaint is factually sparse, D.L. states that students with disabilities involving behavioral challenges are particularly vulnerable to injury resulting from the use of handcuffs.  (Id.)  D.L. also alleges that school personnel, a group that includes Deputy Smith, "were aware that [D.L.] had been diagnosed with non-communicative autism and that he needed a behavior intervention plan to help him manage his disability-related behaviors."  (Id. at ¶ 29.)  As a result of these disability-related challenges, D.L. argues that he was entitled to certain modifications to the HCSO's handcuffing policies and practices, including "crisis intervention, de-escalation, patience, and waiting," and that the HCSO's failure to provide these modifications subjected him to discrimination.  (Id. at ¶¶ 50–51.)

The question for the Court, therefore, is whether, given the HCSO's safety concerns, any modification to the HCSO's procedures was reasonable before Deputy Smith handcuffed D.L. and transported him to a psychiatric facility.  See Bircoll, 480 F.3d at 1085 (explaining "[t]he question is whether, given criminal activity and safety concerns, any modification of police procedures is reasonable before the police physically arrest a criminal suspect, secure the scene, and ensure that there is no threat to the public or officer's safety").  As the Eleventh Circuit has stated, reasonableness is a "highly fact-specific inquiry" and should be decided on a case-by-case basis.  Bircoll, 480 F.3d at 1085–86.  "[T]erms like reasonable are relative to the particular circumstances of the case and the circumstances of a DUI arrest on

the roadside are different from those of an office or school or even a police station."
Id. at 1086.  Courts should consider if time is of the essence in the situation, if there
is a danger to the public, or if the arrestee has difficulty communicating, among
other factors.  Gevarzes v. City of Port Orange, No. 6:12-CV-1126-ORL-37, 2013 WL
610456, at *3 (M.D. Fla. Feb. 19, 2013).

Further, the standard of what is or is not a reasonable law enforcement or
disciplinary tactic in a school changes significantly based on the unique facts of the
case.  See, e.g., Gray ex rel. Alexander, 458 F.3d at 1307 (holding that handcuffing a
child is unreasonable and excessive where the handcuffs were used for "purely
punitive purposes" and "not to pursue an investigation to confirm or dispel his
suspicions that [plaintiff] had committed a misdemeanor"); see also T.W. ex rel.
Wilson v. Sch. Bd. of Seminole Cnty., Fla., 610 F.3d 588, 593–597 (11th Cir. 2010)
(wherein a student with Autism unsuccessfully brought suit against a teacher and
school board for disability-based discrimination after teacher pinned his arm behind
his back while escorting him to the "cool down room").

Here, D.L. argues that because of his disabilities, particularly his difficulty
controlling his behavior and complying with directives, he should not have been
handcuffed or he should have been handcuffed less forcefully.  (Doc. 1 at ¶¶ 28, 52.)
D.L. has alleged that his behavior on the day in question was due to his disability.
(Id. at ¶ 30.)  Given that D.L. was ten years old, was under five feet tall, weighed
ninety pounds, was secluded in a school office, and suffered from non-
communicative autism at the time he was handcuffed, a reasonable modification to

31

the use of mechanical restraints may have been appropriate.  Further factfinding will need to be conducted to determine whether Deputy Smith knew of the unique challenges posed by D.L.'s disabilities when he handcuffed him as well as whether D.L. or his parents had requested any modifications with respect to D.L.'s contact with Deputy Smith or any of the other SROs at Winding Waters.  See S.R. v. Kenton Cnty. Sheriff's Off., 302 F. Supp. 3d 821, 837 (E.D. Ky. 2017) (explaining that a relevant consideration as to whether a student with ADHD and PTSD had adequately alleged disability-based discrimination when he was handcuffed by an SRO was whether he or his mother requested modification as to any contact with the SRO or the county sheriff's office); see also A.G. v. Fattaleh, No. 520-cv-00165-KDB-DCK, 2022 WL 2758607, at *25 (W.D.N.C. July 14, 2022) (finding that a school resource officer failed to provide reasonable modifications where he "used even more force to gain compliance" from a disabled student when that student "failed to comprehend the situation consistent with his disabilities.")  Accordingly, the Court finds that at this stage, D.L. has adequately pleaded that a reasonable modification to the law enforcement officer's policy may have been appropriate, and thus, D.L. has stated a claim for disability-based discrimination under the ADA.

## VI.   D.L.'s claims for punitive damages against the HCSO and Sheriff Nienhuis are due to be dismissed.

The Defendants next argue that D.L.'s claims for punitive damages against the HCSO and Sheriff Nienhuis should be dismissed because the HCSO and Sheriff Nienhuis are "immune from punitive damages under 42 U.S.C. § 1983 and state law." (Doc. 17 at 18–19.)  D.L. responds that the Defendants misstate the law by

citing to a dated case which has since been overruled.  (Doc. 19 at 17–18.)  The Court agrees with the Defendants.

The United States Supreme Court has explained that punitive damages may not be awarded against a municipality unless expressly authorized by statute.  City of Newport v. Fact Concerts, Inc. 453 U.S. 247, 259 (1981).  D.L. has cited to no such statute providing for an award of punitive damages against a municipal entity.  Instead, Florida law provides that while a municipality may be liable for tort claims in the same manner as a private individual, "liability shall not include punitive damages."  Fla. Stat. § 768.28(5)(a).  And as the Eleventh Circuit has noted, "punitive damages are unavailable in a suit against a county."  Chatham v. Adcock, 334 F. App'x 281, 287 (11th Cir. 2009).  "Similarly, local government entities, like [a] [c]ounty [s]heriff's [o]ffice, are immune from punitive damage claims under 42 U.S.C. § 1983."  Morris v. Crow, 825 F. Supp. 295, 299 (M.D. Fla. 1993).  Thus, punitive damages are not available for D.L.'s claims against the HCSO.

Sheriff Nienhuis also cannot be sued for punitive damages.  As the Eleventh Circuit has instructed, a suit against a municipal employee in his official capacity "is the same as a suit against the municipality" itself.  Cooper v. Dillon, 403 F.3d 1208, 1221 n.8 (11th Cir. 2005).  Thus, just as municipalities are immune from punitive damages claims, so too are municipal employees when they are sued in their official capacity.  Colvin v. McDougall, 62 F.3d 1316, 1319 (11th Cir. 1995); see also Young Apartments, Inc. v. Town of Jupiter, FL, 529 F.3d 1027, 1047 (11th Cir. 2008) ("In a [section] 1983 action, punitive damages are only available from

government officials when they are sued in their individual capacities").
Accordingly, the claims for punitive damages against Sheriff Nienhuis are also due
to be dismissed because he was sued in his official capacity under section 1983.

### VII.   D.L. has adequately alleged that Deputy Smith's conduct was not in compliance with Fla. Stat. § 1003.573(f)(3).

Defendants next argue that D.L. cites to and relies on inapplicable statutes,
including Fla. Stat. § 1003.573, which provides guidelines related to the seclusion
and restraint of students with disabilities in public schools.  (Doc. 17 at 19.)
Specifically, D.L. argues that the Defendants failed to take reasonable steps to
ensure compliance with this statute.  (Doc. 1 at ¶ 23).  The language of the statute
refers to the conduct of "school personnel," and Defendants argue that they are not
"school personnel" and therefore the statute does not apply to them.  (Doc. 17 at 20.)
The Court finds that the Fla. Stat. § 1003.573 applies to Deputy Smith and that
D.L. has adequately stated a claim that Deputy Smith violated that statute when he
stated

The statute does not define "school personnel," but the Court agrees that the
HCSO and Sheriff Nienhuis are not "school personnel" as understood by the statute.
D.L. cites no authority in support of the proposition that a municipal entity like a
sheriff's office or a person not employed by a school—under acting under the
direction of a school official—could be considered "school personnel."  In any event,
the plain meaning of "personnel" seems to indicate that a municipal entity cannot
be considered "personnel" because the term refers specifically to "persons."  See
Personnel Merriam-Webster Dictionary www.merriam-

webster.com/dictionary/personnel (last accessed August 5, 2022) (defining "personnel" as "a body of persons usually employed (as in a factory or organization)").  Furthermore, Sheriff Nienhuis cannot be considered "school personnel" because he is not employed by the Hernando County School District.  See id.

Still, Deputy Smith is school personnel under Florida law.  Florida law provides that school resource officers "abide by district school board policies and shall consult with and coordinate activities through the school principal."  Fla. Stat. § 1006.12(1)(b).  School resource officers "shall abide by district school board policies and shall consult with and coordinate activities through the school principal, but shall be responsible to the law enforcement agency in all matters relating to employment."  Id.  And the activities which they conduct "are part of the regular instructional program of the school."  Id.  Further, Florida courts have determined that "a school resource officer assigned full time to work at [a] school . . . is more akin to a school official than an officer on the street."  K.P. v. State, 129 So. 3d 1121, 1132 (Fla. 3d DCA 2013); M.D. v. State, 65 So. 3d 563, 566 (Fla. 1st DCA 2011).  "In this capacity, resource officers are called upon to perform many duties not traditional to the law enforcement function, such as instructing students, serving as mentors and assisting administrators in maintaining decorum and enforcing school board policy and rules."  C.M.M. v. State, 983 So.2d 704, 705 (Fla. 5th DCA 2008).  Thus, because Deputy Smith's activities were coordinated through Winding Waters Elementary School, he is school personnel and subject to Fla. Stat. § 1003.573.

35

Seclusion is defined as "the involuntary confinement of a student in a room or area alone and preventing the student from leaving the room or area."  Fla. Stat. § 1003.573(1)(e).  Importantly, such confinement must be different than a "time-out used as a behavior management technique intended to calm a student."  Id.  School personnel are categorically prohibited from using seclusion when responding to the behavioral needs of students with disabilities.  Id. at § 1003.573(1)(f)(2).  D.L. alleges that "[h]e was removed from his classroom, taken to the school office, and isolated by being placed in seclusion."  (Doc. 1 at ¶ 30.)  D.L. does not, however, state who placed him in seclusion or whether that seclusion was not merely a "time-out" which would comply with the statute.  Thus, as currently pleaded, D.L.'s Complaint does not adequately state a claim that Deputy Smith placed D.L. in seclusion in violation of Fla. Stat. 1003.573(2).

Restraint is defined as "the use of a mechanical or physical restraint," such as "a device that restricts a student's freedom of movement."  Id. at § 1003.573(c).  Restraint may be used "only when all positive behavior interventions and supports have been exhausted" and "only to protect the safety of students, school personnel, or others."  Id. at § 1003.573(3)(a)–(b).  There must be "an imminent risk of serious injury," and restraint cannot be "used for student discipline or to correct student noncompliance."  Id.  D.L. has alleged that Deputy Smith placed handcuffs on him after he was already in seclusion.  (Doc. 1 at ¶ 31.)  No other students or school personnel were at risk of serious injury when D.L. was physically restrained by Deputy Smith.  Accordingly, the Court finds that D.L. has adequately pleaded that

Deputy Smith's conduct—as alleged—was not in compliance with Fla. Stat. § 1003.573(3).  Thus, Fla. Stat. § 1003.573 is not inapplicable as Defendants contend, and is therefore not an adequate ground upon which to dismiss D.L.'s Complaint.

## VIII.   D.L. has failed to allege any violations of his rights under the Florida Baker Act.

Defendants also argue that D.L.'s citation to and reliance on the Florida Baker Act is inapplicable.  (Doc. 17 at 19.)  D.L. argues that the Defendants "failed to avail [him] of his rights as a minor" under two sections of the Florida Baker Act.  (Doc. 1 at ¶ 25.)  The Florida Baker Act authorizes, among other things, the involuntary commitment of children and adults with mental, emotional, and behavioral disorders to treatment facilities.  Fla. Stat. § 394.453(1)(b)(3).  The first section of the Florida Baker Act to which D.L. cites deals with use of force during the involuntary civil commitment of sexually violent predators.  See Fla. Stat. § 394.9223.  D.L. is not a sexually violent predator, however, and therefore, the statute cited does not cover the Defendants' conduct toward D.L.  Accordingly, D.L.'s claims against the Defendants under this statute are due to be dismissed.

The second section of the Florida Baker Act cited by D.L. deals exclusively with minors aged 13 years or older.  See id. at § 394.4784.  D.L. has alleged, however, that he was ten years old when the events at issue took place.  (Doc. 1 at ¶ 27.)  Therefore, section 394.4784 is inapplicable, and D.L.'s claims against the Defendants under this statute are due to be dismissed as well.  In sum, D.L. has failed to allege any violation of his rights under the Florida Baker Act, and thus, any reference to a statute contained therein in his Complaint must be amended.

IX.    **D.L. is not entitled to injunctive relief.**

D.L. seeks injunctive relief prohibiting the Defendants "from authorizing or employing the unnecessary and excessive use of physical restraint and handcuffing on schoolchildren, and the unnecessary seclusion of children, including those with disabilities." (Doc. 1 at ¶ 12.)  D.L. further seeks to have the Court compel the Defendants to "revise their policies, practices, and trainings." (Id.)  The Court will not grant such relief.

"To obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest."  Barrett v. Walker Cty. Sch. Dist., 872 F.3d 1209, 1229 (11th Cir. 2017).  The movant carries the burden of proof with respect to each of these four elements.  C.B. v. Bd. of Sch. Comm'rs of Mobile Co., AL, 261 F. App'x 192, 193 (11th Cir. 2008).

A showing of irreparable injury is "the sine qua non of injunctive relief." Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990).  Still, a violation of constitutional rights alone does not always constitute irreparable harm. Cunningham v. Adams, 808 F.2d 815, 821–22 (11th Cir. 1987).  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981).  As the Eleventh Circuit has explained, "[t]he only areas of constitutional jurisprudence

where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims establishing an imminent likelihood that pure speech will be chilled or prevented altogether." Siegel v. LePore, 234 F.3d 1163, 1178 (11th Cir. 2000).

As best the Court can tell, D.L. argues that the Defendants' policies of handcuffing students with disabilities constitute an ongoing violation of those students' Fourth and Fourteenth Amendment rights. Such alleged constitutional violations do not rise to the level of an irreparable injury, however, because they are not a related to privacy or speech rights, nor are they unable to be remedied with monetary relief. See Slicker v. Jackson, 215 F.3d 1225, 1227 (11th Cir. 2000) (holding that "a § 1983 plaintiff alleging excessive force may receive compensatory damages for such things as physical pain and suffering and mental and emotional anguish" as well as nominal damages so long as he can show that his constitutional rights were violated); Motes v. Myers, 810 F.2d 1055, 1059 (11th Cir. 1987) (stating that where "the use of force and the search were unconstitutional . . . they become elements of damages for the § 1983 claim"); Williamson v. Mills, 65 F.3d 155, 158 (11th Cir. 1995) (explaining that the damages recoverable on an unlawful arrest claim "include damages suffered because of the use of force in effecting the arrest.")

As such, the Court finds that D.L. has not met his burden of showing that irreparable harm would result if permanent injunctive relief was not entered. Because proof of irreparable injury is an essential prerequisite to a permanent injunction, D.L. is not entitled to a permanent injunction. See Siegel, 234 F.3d at

1176 (holding that a failure to establish irreparable injury "would, standing alone, make preliminary injunctive relief improper").  Accordingly, D.L.'s claims for injunctive relief must be dismissed.

## **CONCLUSION**

For the reasons above, it is **ORDERED**:

1.     The Defendants' Motion to Dismiss (Doc. 17) is **GRANTED in part** and **DENIED in part**.

2.     Plaintiff D.L.'s Complaint (Doc. 1) is **DISMISSED without prejudice**.

3.     Plaintiff D.L. is granted leave to amend his Complaint consistent with this Order.  Any amended complaint is due to this Court on or before September 26, 2022.

**ORDERED** in Tampa, Florida, on August 9, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE