UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

D.L., a minor, by and through his next-of-
friends, S.L. and R.L., mother and father of
the minor,

        Plaintiff,

v.                                 Case No. 8:22-cv-35-JLB-AEP

HERNANDO COUNTY SHERIFF'S
OFFICE, a public entity,

AL NIENHUIS, in his official capacity as
Sheriff of Hernando County, Florida,

DEPUTY PAUL SMITH, School Resource
Officer, in his individual and official
capacities,

HERNANDO COUNTY SCHOOL BOARD, a
public entity.

        Defendants.
_____/

## **ORDER**

      Plaintiff D.L., a minor, sued Defendants Hernando County Sheriff's Office

("HCSO"), Sheriff Al Nienhuis ("Sheriff Nienhuis"), Deputy Paul Smith ("Deputy

Smith"), and the Hernando County School Board ("HCSB") for Fourth and

Fourteenth Amendment violations, as well as violations of Title II of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12132.  (Doc. 42.)  Defendants moved to

dismiss D.L.'s initial complaint (Doc. 1) in two separate motions—one from the

HCSO, Sheriff Nienhuis, and Deputy Smith and one from the HCSB—and D.L. has

responded to both.  (Doc. 17; Doc. 19; Doc. 29; Doc. 36.)  Only the second of these two motions to dismiss—that of the HCSB—is addressed in this Order.  A prior order of this Court directed solely towards the motion to dismiss filed by the HCSO, Sheriff Nienhuis, and Deputy Smith dismissed certain claims against those defendants and permitted D.L. to file an amended complaint, which he did.  (See Doc. 37; Doc. 42).

As D.L. notes in his amended complaint—the operative complaint—his claims against the HCSB remain unchanged.[1]  After careful review, the Court **GRANTS** HCSB's Motion to Dismiss (Doc. 29) because Plaintiff failed to exhaust the administrative remedies available to him prior to filing this lawsuit.  Counts III and IV of the First Amended Complaint (Doc. 42) are therefore **DISMISSED without prejudice**.  If D.L. indeed exhausted the available administrative remedies prior to filing suit here, he is granted leave to file a second amended complaint within twenty (20) days of the date of this Order.

## BACKGROUND

D.L. is a child with Non-Communicative Autism, which impedes his ability to "stay[] focused, pay[] attention, control[ his] behavior, comply[] with directives, and [remain] seated."  (Doc. 42 at ¶ 27.)  During the 2017–2018 school year, D.L. was

---

[1] D.L. states he has "not amended the Counts of the Complaint against the Hernando County School Board inasmuch as there is a pending Motion to Dismiss filed by the Hernando County School Board which has not as of yet been ruled on by the Court." (Doc. 42 at 15 n.3; see id. at 16 n. 4.)  It is worth noting, however, that D.L. did apparently remove the claim for punitive damages against the HCSB. (Compare Doc. 1 at ¶ 61, with Doc. 42 at ¶ 66.)  The only other relevant change between the initial complaint and the operative complaint is the count numbers of those claims exclusively against the HCSB.  (Compare Doc. 1, with Doc. 42.)  They are now Counts III and IV.  (See Doc. 42.)

enrolled in the fifth grade at Winding Waters Elementary School ("Winding Waters"), which is administered by the HCSB.  (Id. at ¶ 26.)  School personnel were aware of D.L.'s autism diagnosis and understood that D.L. required a "behavior intervention plan" in order to "manage his disability-related behaviors."  (Id. at ¶ 28.)

On January 10, 2018, while D.L. was in a classroom at Winding Waters, D.L. had an autism-related outburst, wherein he had difficulty "complying with directives from teachers and administrators; controlling his emotions; and, controlling his physical conduct."  (Id. at ¶ 29.)  At the time, D.L. was ten years old, stood 4'10" tall, and weighed ninety pounds.  (Id. at ¶ 26.)  As a result of this outburst, D.L. was removed from the classroom[2] and taken to an office at the school where he was "placed in seclusion."[3]  (Id. at ¶ 29.)  After some time in seclusion, D.L. was handcuffed by Deputy Smith and other school personnel and carried out of Winding Waters' building.  (Id. at ¶¶ 30–31.)  D.L. was then transported by the HCSO to Spring Brook, a mental health facility in Hernando County, where he was involuntarily committed.  (Id. at ¶ 32.)  D.L. suffered "physical injuries," "emotional distress," and "mental suffering" when he was handcuffed and transported from

---

[2] D.L. does not specify in his Complaint who removed him from the classroom or who took him to the school office.  (Doc. 42 at ¶ 29.)

[3] "Seclusion" is a term of art defined in the Florida Education Code as "the involuntary confinement of a student in a room or area alone and preventing the student from leaving the room or area.  The term does not include time-out used as a behavior management technique intended to calm a student."  Fla. Stat. § 1003.573(1)(e).

Winding Waters to Spring Brook.  (<u>Id.</u> at ¶¶ 31–33.)  He "continues to suffer emotional distress" in the aftermath of these events.  (<u>Id.</u> at ¶ 35.)

D.L. brings two claims against the HCSB.  (<u>Id.</u> at ¶¶ 52–66.)  First, he argues that the HCSB violated his right against disability-based discrimination under the ADA.  (<u>Id.</u> at ¶¶ 52–58.)  Second, D.L. alleges that the HCSB failed to make reasonable accommodations in violation of the ADA.  (<u>Id.</u> at ¶¶ 59–66.)  D.L. seeks declaratory relief, injunctive relief, compensatory damages, and attorneys' fees and costs for these injuries.  (<u>Id.</u> at ¶¶ 58, 66.)

Defendant HCSB moves to dismiss, arguing that (1) D.L. failed to exhaust administrative remedies, (2) D.L. failed to state a claim for violation of the ADA against the School Board, and (3) D.L.'s Complaint is an impermissible shotgun pleading.  The Court will assess the merits of these various arguments in turn.  (<u>See</u> Doc. 29.)

## <u>DISCUSSION</u>

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing <u>Hawthorne v. Mac Adjustment, Inc.</u>, 140 F.3d 1367, 1370 (11th Cir. 1998)).  To state a claim, a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Fed. R. Civ. P. 8(a)(2); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "[C]onclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal."  Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) (citation omitted).

>    **I.      D.L. has failed to exhaust his administrative remedies as is required under the Individuals with Disabilities Education Act.**

The HCSB argues that D.L.'s ADA claims against it are barred because D.L. failed to exhaust his administrative remedies as required by the Individuals with Disabilities Education Act ("IDEA").  (Doc. 29 at 6).  D.L. asserts that the exhaustion requirement is inapplicable here because he is not seeking relief for a denial of "free appropriate public education," often referred to by the acronym, "FAPE."  (Doc. 36 at 4–6.)  For the reasons outlined below, the Court finds that D.L. has failed to exhaust his administrative remedies, as required by the IDEA, and accordingly, his claims against the HCSB are due to be dismissed.

The plain language of the IDEA requires that any child with a disability seeking to enforce his rights under, among other federal statutes, the ADA and the IDEA must exhaust the administrative procedures set forth in the section 1415(f) of the IDEA "before the filing of a civil action under such laws."  20 U.S.C. § 1415(l).

Indeed, heeding this statutory mandate, the Eleventh Circuit has repeatedly held that "claims asserted under Section 504 and/or the ADA are subject to [the] requirement that litigants exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under . . . the ADA."

5

Babicz v. School Bd. of Broward Cnty., 135 F.3d 1420, 1422 (11th Cir.1998); M.T.V

v. DeKalb Cnty. Sch. Dist., 446 F.3d 1153, 1158 (11th Cir. 2006) (holding the same).

The IDEA guarantees a FAPE to students with disabilities through the

provision of various special education services, including an "individualized

education program" ("IEP").  See Loren F. ex rel. Fisher v. Atlanta Indep. Sch.

Sys., 349 F.3d 1309, 1311–12 (11th Cir. 2003) (citing 20 U.S.C. § 1414(d)(1)(A)–(B)).

IEPs are aimed at improving students' educational attainment and include a

number of measures designed to evaluate student progress and ensure that

students with disabilities are meeting their academic goals.  20 U.S.C. §

1414(d)(1)(A).  That said, the Eleventh Circuit has explained that the IDEA's

"unambiguous" exhaustion requirement applies to a "broad spectrum of claims,"

namely "any matter relating to the identification, evaluation, or educational

placement of the child, or the provision of a free appropriate public education to

such child," including, among others, claims brought pursuant to the IDEA, the

ADA, Section 504, or the Constitution.  M.T.V., 446 F.3d at 1158 ("This Court has

held any student who wants relief that is available under the IDEA must use the

IDEA's administrative system, even if he invokes a different statute") (internal

citation and quotation omitted).  As the Eleventh Circuit has succinctly stated,

"[t]he philosophy of the IDEA is that plaintiffs are required to utilize the elaborate

administrative scheme established by the IDEA before resorting to the courts to

challenge the actions of the local school authorities."  Id.

Indeed, "[t]he philosophy of the IDEA is that plaintiffs are required to utilize the elaborate administrative scheme established by the IDEA before resorting to the courts to challenge the actions of the local school authorities." N.B. v. Alachua Cnty. Sch. Bd., 84 F.3d 1376, 1378 (11th Cir. 1996).  If the relief sought by a plaintiff can be provided under the IDEA, the plaintiff's ADA or Section 504 legal claims will be subject to dismissal if the plaintiff does not first exhaust his administrative remedies, absent the plaintiff demonstrating that the administrative process is either futile or inadequate.  See MTV, 446 F.3d at 1158.

### A. The structure of D.L.'s Complaint makes it clear that the crux of his claims against the HCSB is the denial of FAPE.

In determining whether a claim alleges the denial of a FAPE, the Court looks to "the gravamen or essence of the claim," and "whether the complaint seeks to harness the means and ends that the ADA provides." Durbrow v. Cobb Cnty. Sch. Dist., 887 F.3d 1182, 1190 (11th Cir. 2018) (citation and quotation omitted).  The Supreme Court has provided clear directions for this analysis, instructing courts to ask two hypothetical questions: "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was not a school—say a public theater or library? And second, could an adult at the school— say, an employee or visitor—have pressed essentially the same grievance?" Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 756 (2017).  Under the Fry test, where these questions are answered affirmatively, the suggestion is that "the heart of the claim does not concern the deprivation of a FAPE, since the claim would not be

inextricably bound to the appropriateness of an intellectually disabled child's educational program."[4] Durbrow, 887 F.3d at 1190.

Here, the gravamen of D.L.'s ADA claim against the HCSB is the HCSB's alleged failure to make accommodations for schoolchildren with disabilities.  (See Doc. 42.)  Specifically, D.L. alleges, among other things, that the HCSB used "improper and unnecessary seclusion, excessive physical force and physical restraints . . . [rather than] providing reasonable modifications to schoolchildren with disabilities, including Plaintiff, such as crisis intervention, de-escalation, patience, and waiting."  (Id. at ¶¶ 55–57.)  D.L. argues that the HCSB was aware that the use of seclusion and "excessive restraint, including mechanical restraints, . . . [on] elementary-aged schoolchildren, including schoolchildren with disabilities, by School Personnel" was "improper[]" and "unlawful" pursuant to a 2009 report by the Government Accountability Office ("GAO"), a 2009 letter from former U.S. Secretary of Education Arne Duncan to Chief State School Officers, and a resultant 2010 Florida Statute titled "Seclusion and restraint of students with disabilities in public schools."  (Id. at ¶¶ 8–11); Fla. Stat. § 1003.573.  The GAO report cited by D.L. provides that the IDEA "requires that eligible students be educated in the least restrictive environment."  Seclusions and Restraints: Selected Cases of Death and

---

[4] Notably, there is an exception to the requirement that a plaintiff exhaust his administrative remedies where doing so would be futile or inadequate.  N.B., 84 F.3d at 1379.  This exception is limited however, as parents cannot "deliberate[ly] disregard and circumvent[] agency procedures established by Congress" through unilateral actions or requests for damages that exceed the authority's capability.  Id.

Abuse at Public and Private Schools and Treatment Centers, U.S. Gov't

Accountability Off. (May 19, 2009) https://www.gao.gov/assets/gao-09-719t.pdf.  The

report further provides:

> IDEA also mandates that special education students have an
> Individualized Education Program (IEP), a written document that in
> part explains the educational goals of the student and the types of
> services to be provided.  IEPs are developed by parents and school
> personnel and may contain instructions related to the use of strategies
> to support the student.  These could include, for example, instruction
> approaches and behavioral interventions such as the use of seclusion
> and restraints.

Id. at 3.

This report, cited by D.L. as a rationale behind the passage of the Fla. Stat. §

1003.573, draws a clear connection between the IDEA, IEPs, and the necessity of

modifying behavioral interventions such as seclusion and restraint when dealing

with students with disabilities.  The letter from Secretary Duncan drew on the GAO

report to warn state officials of the dangers of disciplining children with disabilities

and to encourage such officials to "ensure that every student in every school under

your jurisdiction is safe and protected from being unnecessarily or inappropriately

restrained or secluded."  See Letter from Arne Duncan to Chief State School

Officers, U.S. Dep't of Ed. (Jul. 31, 2009)

https://www2.ed.gov/policy/elsec/guid/secletter/090731.html.  The Florida Statute

passed in response to Secretary Duncan's letter regulates school districts in their

disciplinary treatment of students with disabilities.  (See Doc. 42 at ¶ 11); Fla. Stat.

§ 1003.573.  Thus, the statute governing the conduct which D.L. challenges, is, by

his own admission, derived from reports and commentaries on the appropriateness of certain disciplinary tactics for students with IEPs.  (Doc. 42 at ¶¶ 8–11.)

The upshot of this historical information is that students with disabilities' right to not be subject to a particular type of discipline is closely related to the provision of an educational plan that can meet those students' learning goals. Indeed, D.L. emphasizes this important connection between teachers' instructional approaches and behavioral interventions for students with disabilities by noting that "the Hernando County School District [has a significant percentage of] students with disabilities under the Individuals with Disabilities Education Act (IDEA)."  (Id. at ¶ 20.)  D.L.'s references to these sources and agency opinions in the opening paragraphs of his complaint serve to place the subsequent claims squarely within the realm of public education.  That is, what makes the conduct of the HCSB school personnel allegedly improper and unlawful is that the alleged violative conduct took place in a school and was, per D.L.'s own concession, governed by various pieces of legislation intended to protect students with disabilities in public schools.

Based on the allegations made in D.L.'s operative complaint, therefore, it is clear that his ADA claims against the HCSB "focus[] precisely on the adequacy of the educational program the School District offered [him]."  Dubrow, 887 F.3d at 1190.  These allegations communicate clearly to the Court that the essence of D.L.'s ADA claims is that the HCSB denied D.L. a FAPE by failing to appropriately tailor its disciplinary tactics to his disability.  Fry, 137 S.Ct. at 756.

10

**B. Applying the <u>Fry</u> test, it is clear that the gravamen of D.L.'s claims against the HCSB is the denial of FAPE.**

The <u>Fry</u> test further reveals that the provision of an appropriate education is the central focus of D.L.'s operative complaint.  With respect to the first question of the <u>Fry</u> test—whether the plaintiff could have brought essentially the same claim if the alleged conduct had occurred at a public facility that was <u>not</u> a school—the answer is clearly no.  See <u>Fry</u>, 137 S.Ct. at 756.  That is, D.L. could not have raised the same claim if the conduct occurred in a library or theater, since neither of these facilities routinely provides behavioral interventions for children with disabilities tailored to those children's specific disability-related educational needs.

Where a student has particularized educational needs that require a modification of behavioral interventions, complaints regarding such behavioral interventions are clearly connected to the student's learning program.  <u>Barnett v. Baldwin Cnty. Bd. of Educ.</u>, 60 F. Supp. 3d 1216, 1229 (S.D. Ala. Oct. 8, 2014) (finding that the right of IEP students with disabilities to not be subject to a particular type of discipline "is inextricably intertwined with the development of an IEP plan and the ability of the students to receive appropriate educational services"); <u>J.M. ex rel. McCauley v. Francis Howell Sch. Dist.</u>, 850 F.3d 944, 949 (8th Cir. 2017) (determining that the plaintiff's claim that the school district imposed physical discipline prohibited by his IEP was subject to the IDEA's exhaustion requirement).

This Court is not alone in its answer to the first part of the <u>Fry</u> inquiry.  Several courts have found that students with disabilities challenging school

11

officials' disciplinary tactics as being excessively forceful are required to first exhaust their administrative remedies because, "to the extent [a plaintiff's] claims . . . are based on the proper implementation of . . . an IEP, such claims are for violation of a FAPE." Johnson v. Sikes, No. 4:18-cv-216, 2020 WL 3259538, at *12 (S.D. Ga. June 16, 2020); see also Harris v. Brown, No. 1:20-cv-02320-JPB, 2021 WL 733673, at *4 (N.D. Ga. Feb. 25, 2021) (holding that where a plaintiff claimed that he was entitled to specific disciplinary procedures because of his disabilities and was denied such modifications, he was required to exhaust his administrative remedies because his "allegations of abuse are specifically tied to his IEP and the failure to follow certain disciplinary procedures"); A.H. ex rel. H.C. v. Craven Cnty. Bd. of Educ., No. 4:16-cv-282-BO, 2017 WL 3493612, at *4 (E.D.N.C. Aug. 14, 2017) (finding that the IDEA's exhaustion requirement applied to allegations involving in-school incidents of physical abuse when the abuse was the result of improper "de-escalation techniques" required by a student's IEP).

The above cited cases reflect precisely the sort of claim that D.L. is alleging here.  Specifically, D.L. emphasizes that, because of his disabilities, he was entitled to certain modifications "such as crisis intervention, de-escalation, patience, and waiting" when he "experienced disability-related difficulties including complying with directives from teachers and administrators."  (Doc. 42 at ¶¶ 57, 29.)  These requested changes to school officials' behavioral interventions are clearly related to D.L.'s ability to succeed in the classroom.  Thus, the first question of the Fry test— whether the plaintiff could have brought essentially the same claim if the alleged

12

conduct had occurred at a public facility that was <u>not</u> a school—is due to be answered in the negative.  <u>Fry</u>, 137 S.Ct. at 756.

The second question of the <u>Fry</u> test, which asks whether an <u>adult</u> at the school—say, an employee or visitor—could have pressed essentially the same grievance, is also due to be answered in the negative.  <u>Id.</u>  Where it "strains credulity for [p]laintiffs to insist that an adult could bring a Complaint" containing the text of the operative complaint, the answer to the second question in the <u>Fry</u> test is also negative.  <u>Hayes v. DeSantis</u>, 561 F. Supp. 3d 1187, 1200 (S.D. Fla. September 15, 2021).

Here, D.L. seeks injunctive relief to prohibit Defendant's "policy and practice of imposing unnecessary and excessive physical force and physical restraints including handcuffs, on schoolchildren with disabilities."  (Doc. 42 at ¶¶ 56–58.)  He further states that the effects of "the unnecessary use of physical restraints, including handcuffs, on the basis of disability . . . include substantial and disproportionate physical and emotional injuries, and disruptive exclusions from the <u>school community</u>."  (<u>Id.</u> at ¶ 54) (emphasis added).  The particular needs of schoolchildren, including their desire for inclusion in their schools' communities, are not coextensive with the needs of adults in those same places.  <u>See</u> <u>Durbrow</u>, 887 F.3d at 1191 ("[T]he IDEA does not entitle adult employees and visitors to an individualized special education.")  In sum, an adult at the school could not have made a grievance identical to D.L.'s and therefore, the answer to the second question in the <u>Fry</u> test is also no.

**C.  D.L.'s focus on the HCSB's disciplinary policies and practices—rather than specific instances of abusive conduct carried out by a teacher or principal—tie his claims against the HCSB to the provision of a FAPE.**

In D.L.'s response to the HCSB's Motion to Dismiss, he notes that his "claims do not seek relief for the denial of a FAPE" because "[u]tilizing isolation, seclusion, excessive force, and excessive restraints through use of handcuffs against a child with disabilities to force compliance to the demands of those in authority is not a unique form of disability discrimination limited to a school setting."  (Doc. 36 at 7.)  Specifically, D.L. contends that the harms to a child from such disciplinary tactics do "not result from a denial of access to a 'free appropriate public education'; the harm results from the physical, emotional, traumatic injuries suffered by the child that an IEP cannot remedy."  (Id.)

At this juncture, it is important to reiterate that D.L.'s claims against the HCSB do not revolve around specific instances of violence carried out by HCSB personnel, but rather, the HCSB's general "policy and practice" with regard to school discipline.  (See Doc. 42 at ¶¶ 56–57.)  That is, D.L. does not assert "a claim involving physical abuse of a disabled student by a teacher, acting out of animus or frustration" which, per the Supreme Court in Fry, is "unlikely to involve the adequacy of special education."  See N.P. by Perillo v. Sch. Bd. of Okaloosa Cnty., Fla., No. 3:18-cv-453-MCR-HTC, 2019 WL 4774037, at *14 (N.D. Fla. Sept. 30, 2019) (quoting Fry, 137 S.Ct. at 756 n.9).  Instead, D.L. challenges the HCSB's failure to ensure compliance with Fla. Stat. § 1003.573.  (See Doc. 42 at ¶ 23.)  Meanwhile, the claims alleging specific instances of discriminatory physical abuse

are against the HCSO, Sheriff Nienhuis, and Deputy Smith, not the HCSB.  (<u>Id.</u> at ¶¶ 37–54.)

The substance of D.L.'s claims against the HCSB pertain to the adequacy of the special education provided to him, not the specific conduct of school personnel. For example, D.L. pleads that "[i]nstead of providing reasonable modifications such as crisis intervention, de-escalation, patience, and waiting, Defendant HCSB, including school personnel, escalated encounters with Plaintiff and subjected him to unnecessary seclusion, excessive physical restraint including handcuffing."  (<u>Id.</u> at ¶¶ 63–66.)  Policies and practices which tend to escalate encounters with school resource officers and subject students to instances of excessive force at the hands of SROs deal with the routine discipline of students and are therefore related to the HCSB's educational responsibilities.  <u>See</u> <u>Honig v. Doe</u>, 484 U.S. 305, 322–25 (1988) (explaining that the disciplinary exclusion of disabled students from the classroom based on those students' disability-related misconduct is clearly linked to those students' abilities to have their educational needs met).

In sum, D.L.'s contention that because the school policies at issue here deal with discipline, they must be considered separate and distinct from the provision of a FAPE, is misguided.  (Doc. 36 at 6–8.)  Insofar as they are directed towards keeping D.L. in the classroom, the requested modifications to the HCSB's disciplinary policies and practices could be addressed via his IEP.  Accordingly, D.L. was required to exhaust his administrative remedies before bringing claims in this Court against the HCSB.

**D. Though he was required to exhaust his administrative remedies under the IDEA, D.L. has failed to do so.**

Under the IDEA, plaintiffs may exhaust such remedies by 1) examining all relevant records pertaining to the evaluation and educational placement of their child, 2) requesting prior written notice when the agency proposes, or refuses, to change the child's placement, 3) presenting complaints concerning any aspect of the agency's handling of a free appropriate public education, and 4) requesting an opportunity for an "impartial due process hearing" with respect to any such complaints. N.B., 84 F.3d at 1378. The rationale behind this requirement is to (1) allow administrators to exercise their discretion and expertise on issues that requires these characteristics; (2) establish a full a factual record before court review; (3) prevent a disregard of agency rules and procedures articulated by Congress; and (4) limit unnecessary judicial involvement. Id. at 1379. If the plaintiff is dissatisfied by the decisions made after the impartial due process hearing and wishes to seek relief from a federal court, before doing so, he must first proceed through an administrative hearing and receive a final decision from an administrative judge. See Durbrow, 887 at 1191 (citing 20 U.S.C. § 1415(i)(2)(A)) ("In order to properly exhaust a claim that seeks relief for the denial of a free appropriate public education, the claim must proceed through an administrative hearing and receive a final decision from an administrative judge before review may be sought from a federal district court.").

The operative complaint does not make any claims regarding the exhaustion of D.L.'s administrative remedies. It fails to allege that D.L. presented his

16

grievances to the HCSB or anyone at Winding Waters Elementary School, requested an impartial due process hearing, or sought an administrative hearing before filing suit here.  D.L. does not allege that the HCSB could not address his claims by voluntarily changing its procedures or by willingly paying him damages. D.L. also has not demonstrated that relief could not be granted through an administrative judge or through deliberations between the parties.  Finally, D.L. has made no allegation that an administrative remedy would be somehow futile or inadequate.

For those reasons, D.L. failed to exhaust all administrative remedies before bringing this lawsuit, as required by the IDEA, and accordingly, his claims against the HCSB are due to be dismissed.

<u>**CONSLUSION**</u>

For the foregoing reasons, the Court finds that D.L. was required to exhaust his administrative remedies prior to bringing this ADA disability discrimination lawsuit against the HCSB.  Because he failed to do so, his claims against the HCSB are due to be dismissed.

Accordingly, it is **ORDERED**:

(1) Defendant HCSB's Motion to Dismiss (Doc. 29), which the Court construes as relating to Counts III and IV of the Amended Complaint (Doc. 42), is **GRANTED**;

(2) Plaintiff's claims against the HCSB as set forth in Counts III and IV of the Amended Complaint (Doc. 42) are **DISMISSED without prejudice**;

(3) In the event Plaintiff has exhausted his administrative remedies under the IDEA, Plaintiff is granted leave to file a second amended complaint within twenty (20) days of the entry of this Order; and

(4) If no second amended complaint is filed within twenty (20) days of the entry of this Order, then the Clerk of Court is directed to terminate the Hernando County School Board as a party in this case.

**ORDERED** at Tampa, Florida on November 8, 2022.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE