IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

D.L., a minor, by and through his
next-of-friends, S.L. and R. L.,
mother and father of the minor,

       Plaintiffs,                 **DISPOSITIVE MOTION**

v.                           Case No.:   8-22-CV-00035

HERNANDO COUNTY SHERIFF'S
OFFICE, a public entity,
AL NIENHUIS, in his official capacity
as Sheriff of Hernando County,
Florida; DEPUTY PAUL SMITH, School
Resource Officer, in his individual
and official capacities, and HERNANDO
COUNTY SCHOOL BOARD, a public entity,

       Defendants.

---

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs hereby move the Court to grant partial summary
judgment in favor of Plaintiffs. While some disputed issues of fact
remain for trial, Plaintiffs file this Motion for Partial Summary
Judgment because there is no dispute of material fact that:

1. The Hernando County School District (the "District") and
Deputy Paul Smith ("Deputy Smith" or "SRO") unlawfully seized D.L.
for involuntary commitment and examination under the Baker Act in

violation of his rights under the Fourth Amendment;

2. The District and the SRO unnecessarily use unnecessary and excessive physical restraints, handcuffs and shackles on D.L. subjecting him to unlawful and excessive force in violation of his Fourth Amendment rights;

3. Plaintiff D.L. was a qualified individual with disabilities under Title II of the Americans with Disabilities Act ("ADA") and the District and Hernando County Sheriff's Office ("Sheriff's Office") are covered entities under this statute;

4. The District violated D.L.'s rights under the ADA by failing to make reasonable accommodations and modifications for D.L. as a child with a developmental disability, autism;

5. The District and the Sheriff's Department failed to provide D.L. with reasonable accommodations and modifications in connection with the effectuation of D.L.'s seizure and in the use of excess force in violation of the ADA; and

Partial summary judgment is appropriate because there are no genuine disputes of material fact as to these issues. Fed. R. Civ. P. 56. Plaintiffs' Motion is based on this Motion and its accompanying Memorandum of Law, accompanying depositions, and exhibits,

pleadings filed in this action, any matter that may be judicially
noticed, and any other matter raised in oral arguments that may
occur in support of this Motion.

**MEMORANDUM OF LAW**

## I. Introduction

This case is about a ten-year old, non-communicative, non-
verbal severely autistic boy, who was physically restrained,
handcuffed and involuntarily committed for psychiatric examination
under the Florida Mental Health Act, Fla. Stat. §§ 394.451- 47892,
(the "Baker Act") by the District and the Deputy Smith.

The Plaintiff in this case, D.L., was known by the school district
and the SRO to have been diagnosed with autism. (Smith depo, p.
129, l. 18 - p. 131, l. 18)    School district personnel, including the
SRO, were aware that D.L. had a history of autistic meltdowns or
tantrums while at school and that the meltdowns involved a history
of behaviors that were manifested by D.L on the date of the incident,
January 10, 2018. (Smith depo, p. 130, l. 14 – 25).  School district
personnel, including the SRO, were aware that all of his previous
meltdown episodes had either been resolved by school district staff,
or if unable to have been resolved by staff, were handled by

contacting his parent(s) who took him home. (Smith depo, p. 130, l. 14 – 25).

On the day of the incident, school staff determined that D.L was having a meltdown (out-of-control having a tantrum); (Castoria depo., p. 1250, lines 1-2) so, they escorted him into an office in the administrative suite. The video of him being escorted into the administrative suite does not show D.L. engaged in any aggressive behaviors. (Roberts Depo p. 175, line 11 – 18). It was not until after he was taken into the office, where there were apparently no video cameras, that D.L. was described as engaging in aggressive behaviors, including hitting, kicking, flailing his arms and legs, laying on the floor, hitting, attempting to throw objects, and banging his head. (Minichino depo., p. 55, lines 8-21; p. 93, line 14 to p. 94, line 16). These were all behaviors that had existed prior to January 10, 2018, and they had previously been identified and documented by school personnel. (Castoria depo. p. 97, line 1-5; p. 99, line 3-21)

School personnel, including the SRO, have described D.L.'s behavior as being out of control, and that they had been unsuccessful in calming him. (Castoria depo., p. 150, lines 1-2). In the short time that D.L. was in the office before being taken out of the school –

handcuffed from behind, shackled, and carried out in a prone position – and placed into a patrol car for transport to a psychiatric facility, ten adults had all entered the room at some point in time to interface or interrelate with D.L., including Ms. Castro, his teacher; Mr. Roberts – a former NCAA defensive back – his paraprofessional; Ms. Minichino, an assistant principal; Ms. Castoria, an elementary assistant; Ms. Jenifer De Armis, an assistant principal; Ms. Cerro, the school principal; Ms. Kimberly Jones, the guidance counselor; Mr. Isaiah Ilowit, the school psychologist; Ms. Michele Pearson, a behavior specialist; and Deputy Paul Smith. (Exhibit _____ Emergency Incident Report).

Yet these ten adults – outnumbering D.L. ten to one – testified in their depositions that they were not able to control D.L., a ten-year old severely autistic boy weighing 75-80 pounds. Alarmingly, from their testimony, they were also unable to protect him.

Notwithstanding that D.L.'s behaviors were of the same nature as previously manifested and with knowledge that D.L.'s mother advised Deputy Smith not to Baker Act D.L., the SRO decided that he was going to subject D.L. to involuntary commitment for psychiatric evaluation under the Baker Act. The SRO's decision was

made in a short period of time while D.L was sequestered in the office. The SRO made his decision to Baker Act D.L. when he witnessed D.L attempt to bite Mr. Roberts, his paraprofessional. (Smith depo., p. 54, line 4-17). Ms. Castoria deposition testimony was that Mr. Roberts was in the office initially with D.L., but that she did not see him after Ms. Minichino and Ms. De Armis entered the room which would indicate that the SRO made the decision to Baker Act D.L. during the initial stage of D.L. being in the office. (Castoria dep. P 153, lines 17-19; p 155, lines 3).

There was no evidence that any of the ten staff members indicated that D.L. had a mental illness; instead, they uniformly recognized that D.L. was out-of-control (having a tantrum and meltdown) attendant to his autism. In fact, they were unsuccessfully attempting calming techniques that they had on previous occasions used when D.L. was having an autism meltdown. (Smith Depo, p. 39, line 11-23; p. 54, line 18-p. 55, line 7).

Critical to the decision making of the SRO upon his determination to commit D.L. to an involuntary commitment for psychiatric evaluation under the Baker Act is that which he wrote contemporaneously on the Report of Law Enforcement Officer

6

Initiating Involuntary Examination wherein he gave the reason for having Baker-Acted D.L. was that "he has autism and was having a meltdown." (Exhibit H).

Having determined that D.L. was being Baker Acted because "he has autism and was having a meltdown" constituted a violation of Florida Mental Health Act, Fla. Stat. §§ 394.451- 47892, (the "Baker Act") that prohibits children with developmental disabilities, including autism, from being committed for involuntary examination under the Act.

Having been physically restrained while in the office under the control of ten adults, D.L. was handcuffed behind his back, shackled, and removed from the school in a prone position by two additional deputies who had arrived to help the SRO effectuate the involuntary commitment, and placed in the back seat of a patrol car to be transported to a psychiatric facility. (Smith depo, p. 55, line 9 – p. 61, line 8).

By violating the Baker Act in having a child with a developmental disability – autism- committed for involutory, Deputy Smith violated D.L.'s right under the Fourth Amendment of the United States Constitution to be free from unlawful seizure.

## II.    Standard of Review

### A. Summary Judgment Standard of Review

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material issue of fact is one that might affect the outcome of the case. See id. "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue [of fact] for trial." Id. at 249. Unless a jury could return a verdict in favor of the nonmoving party, no genuine issue of fact exists. See id.; *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998) (citations omitted).

When assessing whether there is a genuine issue of material fact, the court views the evidence, and all reasonable factual inferences, "in the light most favorable to the nonmoving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F. 3d 913, 918 (11th Cir. 1993). Summary judgment may be granted, however, when the

evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249–50 (internal citation omitted). "A mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that would preclude summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

### B. Municipal Liability
### for
### Constitutional Violations Under § 1983

Section 1983 provides liability for "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws …" 42 U.S.C. § 1983. A municipality or other local government, such as the School Board, is liable under Section 1983 if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. See *Monell v. New York City Dep't.*

*of Soc. Servs.*, 436 U.S. 658, 691–92 (1978). A local-government entity is liable under Section 1983 for its own illegal acts. *Monell* at 665–83. To establish a local-government entity's liability, a plaintiff must prove that "action pursuant to official municipal policy of some nature" caused his injury. *Monell,* 436 U.S. at 691.

Municipality liability for the unconstitutional acts of their personnel may be demonstrated through a formal policy, a custom (also known an informal policy), or failure to train. A formal policy is simply "a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A "custom" is "a practice that is so settled and permanent that it takes on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (quoting *Wayne v. Jarvis*, 197 F.3d 1098, 1105 (11th Cir. 1999)). A "custom" must be "so pervasive" as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir. 1994). "Actual or constructive knowledge of such customs must be attributed to the governing body of the municipality." *Church*, 30. F.3d at 1345

10

(quoting *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986)).

Similarly, a municipal policy or custom may also include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of its inhabitants.'" *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).   To establish deliberate indifference, the "plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Lewis*, 561 F.3d at 1293 (internal quotation omitted). A municipality "may be put on notice in two ways." Id. First, if the municipality "is aware that a pattern of constitutional violations exists, and nevertheless fails to provide adequate training, it is considered to be deliberately indifferent." Id. Alternatively, "deliberate indifference may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious." Id.

## III.    SRO Individual Liability for <u>Illegal Seizure</u> of D.L.

Plaintiff established a violation of the Fourth Amendment's

protection against an illegal seizure by showing that there was no probable cause to detain D.L. under Florida's Baker Act. *Khoury v. Miami-Dade Cnty. Sch. Bd.,* 4 F.4th 1118, 1126 (11th Cir. 2021); see [R. & R., ECF No. 73 at 30 (adopted at ECF No. 148)]. Whether probable cause exists depends on whether, given the totality of the circumstances, a reasonable officer could have believed that the criteria of the Baker Act were met. *Khoury*, 4 F.4th at 1126. For an officer to detain someone properly under the Baker Act, adult or child, the officer must have "reason to believe that the person has a mental illness and because of his or her mental illness . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm . . . to himself or herself or others in the near future, as evidenced by recent behavior." Fla. Stat. § 394.463(1)(b)(2) (2017). "Vague notions about what a person might do—for example, a belief about some likelihood that without treatment a person might cause some type of harm at some point— does not meet this standard." *Khoury*, 4 F.4th at 1126 (emphasis in original).

Here, Deputy Smith knew for a fact that D.L. had developmental disabilities – autism- and therefore did not have probable cause to

believe that D.L. had a mental illness. Developmental disability is not synonymous with mental illness and, under the circumstances presented to Deputy Smith, he would not have a reasonable basis to believe that a ten-year old boy acting out behaviors that he knew had been previously manifested in school was mentally ill.  Moreover, Deputy Smith did not have probable cause to believe that without care or treatment, D.L. would have caused serious bodily harm to himself or others in the near future.  D.L. – weighing 75 to 80 pounds - was outnumbered ten to one, he did not have any weapons or dangerous objects, did not have imminent access to weapons, did not have weapons or dangerous objects, did not have imminent access to weapons or any item that could be said to cause 'serious bodily injury', he did not have a meaningful opportunity or access to carry out any threats, and the harm inflicted to himself was not serious, caused no serious injury, and did not require any sort of medical treatment.  Likewise, there was no documentation that any staff member received any serious bodily injury or even required medical attention.

Deputy Smith did not have probable cause to believe that D.L. met the statutory criteria of the Baker Act.  A reasonable officer could

not have believed that D.L. had a mental illness.  He has provided his deposition testimony that establishes: (a) he was aware prior to the date of the involuntary examination that D.L. had Autism; (b) he knew D.L. had a disability; (c) he knew that D.L. was being educated in an ESE classroom; (d) the very same behavior D.L. exhibited on the day of the involuntary examination is the same as previously manifest as being part of his Autism consisting of hitting, kicking, spitting, throwing objects; (e) there is no evidence that any school records or any school staff member advised him that D.L. had a mental illness; (f) he equated autism with a "mental disability"; (g) he described out-of-control to mean not physically fighting, but…squirming, kicking his legs to try to break free; (h) it was when he saw D.L. bite himself one time and attempt to bite Mr. Roberts that he determined that D.L. met the Baker Act criteria; (i) he saw no physical injuries requiring medical treatment and the one bite was not bleeding; (j) he contemporaneously self-described the basis for his determination that D.L. met the criteria for Baker Act by reporting "he has Autism, and was having a meltdown."

Deputy Smith also did not have reason to believe that D.L. would cause serious bodily harm to himself or others in the near

future.  An 80-pound ten-year-old boy, outnumbered by ten to one does not raise the threat of serious bodily harm to self or others.  The only harm to D.L. described by Deputy Smith was that he bit himself once without bleeding.  In his deposition he did not indicate that he took into consideration the observation of school staff that were, from time to time, in the room with D.L.   D.L. did not need medical treatment; and, there is no evidence that any staff was seriously injured or had to seek medical attention did any of the school staff indicate that they needed medical treatment.  Deputy Smith did not have probable cause to believe that without care or treatment, D.L would cause serious bodily harm to himself or others in the near future.  He did not have weapons or dangerous objects.  The facts, coupled with those in the above paragraph show the lack of probable cause that D.L. would cause serious bodily harm to himself or others in the near future.

Deputy Smith himself shows that he lacked probable cause to have committed D.L. to involuntary commitment and examination when he contemporaneously stated his reasons for Baker Acting D.L. was because he has autism and was having a meltdown.

## IV.    SRO Individual Liability for <u>Excessive Force</u> of D.L.

Excessive force claims are a discrete constitutional violation when the force applied is alleged to be excessive, even if the seizure's legality is not challenged. See, e.g., *Jackson v. Sauls*, 206 F.3d 1156, 1171 (11th Cir. 2000) ("[A] claim for excessive force during a legal stop or arrest is a discrete claim."); *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1332 (11th Cir. 2006) ("[A]n excessive force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest."). Independent of the Plaintiff's illegal seizure claim, his excessive force claim is entitled to separate consideration.

Claims that law enforcement used excessive force in the course of a "seizure" of an individual are analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Factors relevant to evaluating reasonableness include: (1) the severity of the "crime" at issue; (2) whether there is an immediate threat of harm to the officers or others; (3) whether there is an attempt to actively resist or evade the officer; (4) the need for force to be applied; (5) the amount of force applied in light of the nature of the need; and (6) the severity of the injury.

16

*Graham*, 490 U.S. at 396; *Patel v. City of Madison*, 959 F.3d 1330, 1339 (11th Cir 2020) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1197–98 (11th Cir. 2002); Sebastian v. Ortiz, 918 F.3d 1301, 1308 (11th Cir. 2019)).    The Eleventh Circuit has also specifically noted the importance of a child's age in assessing reasonableness. See *Gray ex rel. Alexander v. Bostic*, 458 F. 3d 1295, 1306–07 (11th Cir. 2006).

To determine whether the amount of force used by a police officer was proper, a court must ask whether a reasonable officer would believe that this level of force is necessary in the situation at hand.  *Penley v. Eslinger*, 605 F. 3d 843, 850 (11th Circ. 2010).  In order to determine whether the force used in a seizure is reasonable, the Court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Tennessee v. Garner*, 105 S.Ct. 1694, 1699 (1985).  The Supreme Court in *Graham* outlined a number of factors to be considered in this balancing test, including, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

17

Admittedly, D.L. was engaged in disruptive behavior associated with his autism; however, mere disruptive behavior is not a severe offense.  See *Vinyard v. Wilson,* 311 F 3d 1340, 1347 (11th Cir. 2002). In Deputy Smith's own words, "he has autism and was having a meltdown."

Next, there is little indication that D.L. was posing a threat to Deputy Smith or any others.  Prior to being placed in handcuffs, Deputy Smith had physically restrained D.L and prior to the decision to Baker Act D.L., D.L. had been physically controlled by Mr. Roberts, D.L's paraprofessional, and then by Deputy Smith because Mr. Roberts look to being tired.  From Deputy Smith's own perspective per his testimony, D.L. was not physically fighting; he was fidgeting trying to free his legs.  He had not hurt himself other than to bite his arm; and, he had not hurt anyone else, other than attempting to bite Mr. Roberts.  It was because D.L. had bitten himself and tried to bite Mr. Roberts that was the event that Deputy Smith thought D.L. met the criteria for being Baker Acted.   D.L. was isolated in an administrative office, away from his classmate, under the supervision of ten school staff members, including Deputy Smith.

D. L. was not trying to flee from the administrative offices; in

18

fact, he was physically precluding from fleeing by the ten adults that were supervising him. He was controlled by ten adults and was not able to communicate with them. By virtue of his young age, small size, non-verbal status, engaging in an autistic meltdown, he was physically restrained, handcuffed behind his back, shackled, and removed from the school and placed in a patrol car for transport to a psychiatric facility.

The Eleventh Circuit's opinion in *Gray ex rel. Alexander v. Bostic*, 458 F. 3d, 1295 (11th Cir. 2006), put Deputy Smith on notice that his conduct in the use of aggressive force against D.L., including the use of physical restraint, handcuffing[1], and shackling a ten-year-old boy with autism was an obvious violation of D.L.'s Fourth Amendments rights.

## V.    School District Liability for <u>Illegal Seizure</u> of D.L.

Florida Statutes enable district school boards to establish school resource officer programs through a cooperative agreement with law enforcement agencies. (§1006.12(1), Fla. Stat. (2017)). School

---

[1] Neither Deputy Smith nor Deputy Boyland could recall who actuall put the handcuff's own D.L. However, their deposition testimony reflects that the handcuffing of D.L. was made by both deputies in concert with each other. (Smith Depo p. 59, line 1 - 55)

resource officer programs are established by district school boards as authorized by said statute. In creating school resource officer programs, the legislature requires school resource offices to comply with policies of the school board. Such was the case with the Hernando County School Board in 2018. The statute provides that "school resource officers shall abide by school board policies and shall consult with and coordinate activities through the school principal..." (§1006.12(1)(b). This Court has previously determined that school resource officers are school personnel. (Order on MSJ, Section III. Page 6, the Honorable John L. Badalamenti, U.S. District Court, 11/16/2023). By virtue of school resource officers being school personnel subject to school board policy, Deputy Smith was subject to complying with school board policies on January 10, 2018.

For the reasons set out in paragraph III above, D.L. suffered a violation of his Fourth Amendment Rights to be free from illegal seizure by virtue of him having been involuntary commitment for examination under the Baker Act by reason of having autism and having a meltdown.

The deprivation of his constitutional right to be free from illegal seizure was caused by a school district policy, custom or a failure to

train.

The District is further liable for the illegal use of the Baker Act by its school personnel, including its SRO, because the District failed to properly train its school personnel on the Baker Act and its ongoing failure amounted to deliberate indifference towards its students and D.L. in particular.

The School District has not identified or provided any policy that the District had in place in 2018 on the subject of utilization of the Baker Act on students at the public schools in Hernando County. Furthermore, no deponent has indicated having been trained in the area of the Baker Acting of students, and in particular students with developmental disabilities. The SRO testified that he did not recall receiving any training from the school district on the subject. As discussed above regarding *Monell* liability on the part of the District, for D.L. to have illegal seizure claim against the District, it is necessary that he establish the existence of "deliberate indifference" on the part of the District. *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1293 (11th Cir. 2009). "Deliberate indifference" may be proven without evidence of prior incidents, if the likelihood for constitutional violation is so high that the need for training would be obvious. *Id.*

21

This in consistent with the U. S. Supreme Court's decision in *City of
Canton Ohio v. Harris*, 489 U. S. 378, 109 S. Ct. 1107, 103 L. Ed. 2d
412 (1989).  Under *City of Canton*, a plaintiff may show objective
deliberate indifference by showing an obvious need to train.  The
Supreme Court in *Harris* gave an illustration of obvious notice that
establishes deliberate indifference.  The example given was as to the
proper use of firearms and the correct use of deadly force as an area
that would be so obvious as to require adequate training by the
municipality to avoid liability.  *City of Canton*, 489 U. S. at 390 n. 10.
Likewise, the Eleventh Circuit's *Lewis,* decision cited above follows
the *City of Canton* principal that a municipality can be liable for a
failure to provide training that results in a constitutional deprivation
where the failure to train reflects deliberate indifference to the
constitutional rights of its inhabitants.

In the case at bar, the act of Baker Acting a student, and
especially a student with a developmental disability, involves a
valuable constitutional right under the Fourth Amendment – the
right to be free from unreasonable seizures.  The School District acted
with deliberate indifference in that the likelihood of a constitutional
violation in seizing students with developmental disabilities is so high

22

so as to make the need for training of school personal obvious. Every
incident of seizing a student under the Baker Act, by definition,
means that every student has been involuntarily deprived of their
liberty and that therefore, without training, there is a high likelihood
of a constitutional violation in taking away the student's liberty. The
likelihood of depriving a student with a developmental disability of
the right to be free from involuntary seizure is even greater given the
vulnerability of a developmentally disabled student and given the
prohibition in the law against involuntarily committing a child with
a developmental disability.

Reflective of the failure to provide adequate training of school
personnel, including the SRO, is shown, in part, by several facts, to-
wit:

- School personnel assisted the SRO in effectuating the
  seizure of D.L., by multiple staff members continuing to
  restrain D. L. after the SRO had initiated the Baker Act. As
  such, they aided and abetted in the seizing of D.L. for Baker
  Act purposes;

- The SRO indicated that he could not describe what
  constituted a developmental disability (Smith Depo, p. 107,

lines 1 – 17).

- The SRO indicated that he thought autism was a "mental disability" (Smith Depo, p. 127, line 24 – p. 138, line 7).

Plaintiff has established a violation of the Fourth Amendment's protection against an illegal seizure by showing that there was no probable cause when the SRO, aided and abetted by other school personnel, seized D.L. under Florida's Baker Act and had him involuntarily committed and examined.

The School District is liable for the unlawful seizure of D.L. inasmuch as the School District failed to provide adequate training to school personnel as to the use of the Baker Act given that there was a high likelihood for constitutional violations so that the need for training was obvious.

## VI. The District and the Hernando Count Sheriff's Office Discriminated against D.L. by Failing to Provide Reasonable Accommodations Under the ADA.

### *Legal Standard*

Title II of the Americans with Disabilities Act ("ADA") mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity." 42 U.S.C. § 12132.

A Plaintiff establishes discrimination under the ADA by showing that the Plaintiff was a qualified individual with a disability who "was subjected to unlawful discrimination because of his disability." *J.A.M. v. Nova Se. Univ., Inc.*, 646 Fed. Appx. 921, 926 (11th Cir. 2016) (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). A plaintiff can show that he was subjected to unlawful discrimination by showing that the defendant failed to make reasonable accommodations or modifications as "necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130. A plaintiff need not show any discriminatory animus when a "covered entity breaches its affirmative duty to reasonably accommodate the known physical or mental limitations of an otherwise qualified person." *Iaciofano v. Sch. Bd. of Broward Cnty.*, No. 16-cv-60963, 2017 WL 564368, at *3 (S.D. Fla. Feb. 13, 2017) (quoting *Forbes v. St. Thomas Univ., Inc.,* 768 F. Supp. 2d 1222, 1227 (S.D. Fla. 2010)); see also *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) ("[B]oth the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals. Where a defendant fails to

meet this affirmative obligation, the cause of that failure is irrelevant."). A requested accommodation is reasonable unless it would impose "undue financial and administrative burdens" or would require a "fundamental alteration in the nature of [the] program." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287 n.17 (1987) (alteration in original).

In order for a Plaintiff to proceed in an ADA case for violations under the ADA the plaintiff must show intentional discrimination in or to obtain compensatory damages against a school district. A.J.T.*, by and through her parents, A.T. & G.T., Petitioner v. Osseo Area Schools*, 145 S. Ct. 1647 (June 12, 2025). The requisite "intentional discrimination" satisfied by proof that the defendant acted with "deliberate indifference. That standard does not require not require a showing of personal ill will or animosity toward the disabled person. Rather, to show deliberate indifference, it is enough that a plaintiff proves the defendant disregarded a "strong likelihood" that the challenged action would "result in a violation of federally protected rights." Id at 1547.

### Basis of District Liability Under the ADA

Plaintiff was a student with a developmental disability who was

26

enrolled in an ESE classroom which included students with Autism.

There is no dispute that, currently and at all relevant times, the District is a "public entity" under the meaning of the ADA; see, e.g. *Alboniga v. Sch. Bd. of Broward Cnty, Fla.*, 87 F. Supp. 3d 1318, 1331-32 (S.D. Fla. 2015) (public school district is a "public entity" for purposes of Title II of the ADA). As such the District is prohibited from discriminating against students with disabilities in its programs and activities.

Despite knowing that D.L. had a developmental disability that caused behaviors including those exhibited on the day of his involuntary examination, District staff did not provide D.L. with accommodations that should have been obvious and were documented in D.L.'s educational records. There is no material dispute of fact that District staff knew that D.L's disability-related behavior could include behaviors that were exhibited on the day of his involuntary examination. D.L.'s school records recorded that he was non-communicative and had "difficulty complying with requests" when there were changes in environment or with adults. There is no dispute that these difficulties were related to D.L.'s developmental disability: D.P.'s school records attributed these difficulties to his

disability of Autism Spectrum Disorder.

There is no material dispute of fact that District staff were aware of reasonable modifications and accommodations that they had employed in the past to successfully de-escalate D.L. and allow him access to District programs and activities. The District had extensive experience de-escalating D.L. in the past, obviating any perceived need for a Baker Act. The District had documentation the need for managing his combative, noncompliant, aggressive, violent behaviors documented over several years; however, the Individual Education Plans, (IEP); Functional Behavior Analysis (FBA); Behavior Intervention Plans were inadequate and deficient resulting in the District failing to provide D.L. with reasonable accommodations and modifications as required by the ADA.

Prior to the involuntary examination, the District was aware that D.L.'s parents had requested additional accommodations and modifications by requesting a change in his various educational behavior plans. The District also knew that D.L. was in need of additional accommodations and modifications in his functional behavioral analysist (FBA) and behavior intervention plan (BIP). The District knew that the FBA and BIP in place had been inadequate

28

and deficient in addressing D.L.'s needs for additional accommodations and modifications inasmuch as the accommodations and modifications in his IEP, FBA, and BIP were inadequate and deficient.

Despite this knowledge, District staff did not allow D.L. to even have access to the accommodations in behavior plans, albeit inadequate and deficient, so as to enable D.L. to control his behaviors associated with his autism and to avoid being Baker Acted. He was over-whelmed by ten adults contrary to behavior plans that provided he was to be in the presence of multiple adults when in a behavior crisis. There is no evidence that D.L. was provided with any form of communication mechanism, even some form of low tech communication system, while being sequestered in a room with ten adults - a failure in dealing with an autistic child in a crisis identified by the Defendant's own expert witness, Dr. Allison Walker, PhD. (Walker depo, p. 45, line 1 – p. 48, line 7). The District did not calm D.L.'s behaviors, instead school personnel exacerbated his behaviors resulting in him being involuntarily committed and examined.

Due to the District's uncontested failure to provide reasonable accommodations and modifications to avoid D.L.'s involuntary

examination, D.L. is entitled to summary judgment that he experienced disability discrimination.

The facts in this case shows that D.L. manifested the same pattern of disruptive, defiant, non-compliant behavior over a number of years. Notwithstanding, the school district disregarded a strong likelihood that D.L.'s involuntary commitment and examination would occur as a result of a course of action that was either willfully or negligently ignored by the school district in the failure to have adequate and non-deficient IEPs, FAP's and BIP's in place as an accommodation for D.L.

Additionally, the Plaintiff's mother testified that the school district showed express malice against D.L. She testified that D.L. was placed into a room with the SRO and was told by Ms. Castoria to look at your son that he is acting like an animal. Such demeaning, dehumanizing comments were made several times.    Following the referencing of her son to an animal, the mother was told by Ms. Castoria that D.L.'s behavior did not change that the police would be called and he would be Baker Acted. Such comments were prophetic. These comments are evidence not only of deliberate indifference, but also of actual malice. (S.L. Depo Excepts, pp. 80, 8191, 93 Exhibit

I).

*Basis for Sheriff's Office Liability Under ADA*

As this Court has previously ruled, a county law enforcement department is a public entity and thus a proper party to a claim for disability-based discrimination brought under Title II of the ADA. (Docket # 37 Order 08-09-2022).  The ADA was enacted by Congress "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title II of the ADA specifically targets public entities, providing that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Congress has explicitly provided that a "public entity" for the purposes of ADA coverage includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1); see also 28 C.F.R. § 35.104 (defining "public entity" as, among other things, an "instrumentality of a State or States or local government"). A county law enforcement

department is a public entity and thus a proper party to a claim for
disability-based discrimination brought under Title II of the ADA. See
*Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1084 (11th Cir. 2007)
(explaining that the plaintiff "could still attempt to show an ADA
claim under the final clause in the Title II statute: that he was
'subjected to discrimination' by a public entity, the police, by reason
of his disability.'").

Discrimination under the ADA is established by showing that
the plaintiff was a qualified individual with a disability who was
subjected to unlawful discrimination because of his disability. *Cash
v. Smith*, 231 F. 3d 1301, 1305 (11th Cir. 2000). A plaintiff can show
that he was subjected to unlawful discrimination by showing that the
defendant failed to make reasonable accommodations or
modifications as "necessary to avoid discrimination on the basis of
disability." 38 C.F.F. §35.130. It is not necessary for the plaintiff to
show any discriminatory animus when a "covered entity breaches its
affirmative duty to reasonably accommodate the known physical or
mental limitations of an otherwise qualified person." *Forbes v. St.
Thomas Univ., Inc.* 768 F. Supp 2d 1222, 1227 (S.D. Fla. 2010). See
also *Bennett-Nelson. V. La. Bd. of Regents*, 431 F. 3d 448, 454-55 (5th

Cir. 2005) ('[The] ADA … impose(s) upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals.    Where a defendant fails to meet this affirmative obligation, the cause of that failure is irrelevant.")

In order to obtain compensatory damages for failure to accommodate under the ADA, the U. S. Supreme Court, without directly addressing the question, has indicated that "courts of appeals generally agree that a plaintiff must show intentional discrimination" A.J.T.*, by and through her parents, A.T. & G.T., Petitioner v. Osseo Area Schools*, 145 S. Ct. 1647 (June 12, 2025).  On that score, the opinion states that "a majority" of the Courts of Appeals to have weighed in on the question … find the requirement to show "intentional discrimination" satisfied by proof that the defendant acted with "deliberate indifference."  That standard "does not required a showing of personal ill will or animosity toward the disabled person."    Rather, to show deliberate indifference, it is enough that a plaintiff proves the defendant disregards a "strong likelihood" that the challenged action would "result in a violation of federally protected rights." (Internal citations omitted) *Id* at 1655.

There has been no evidence provided that establishes that the

Sheriff's Office had adopted any policy or provided any training as to
the duty of SROs to provide reasonable accommodations and
modifications under the ADA to school children with developmental
disabilities, including those who are non-verbal because of their
developmental disability.

Deputy Smith testified that he did not recall ever receiving any
training from law enforcement in regards to providing accommodates
under the ADA to individuals with disabilities. (Depo.  P 102, l. 2 –
11).  When asked if he was familiar with the provisions of the ADA as
a law enforcement officer, he responded that "I couldn't tell you about
it." (Depo. P. 103, 113-19).  Deputy Smith was unable to articulate
the duties of a law enforcement officer acting as an SRO to provide
an accommodation to a child with developmental disabilities.  (Depo
p. 107 – p 109).

The seizing of a ten-year-old, 80-pound child, and other
similarly situated children with developmental disabilities, faced with
the foreseeable possibility of being involuntarily physically
restrained, handcuffed, shackled and forcefully removed from school,
involuntarily committed for psychiatric evaluation establishes a
strong likelihood that the challenged action would result in a

violation of federally protected rights. The federally protected rights that are foreseeably violated in such a situation include the right to be free from unreasonable force and unreasonable seizure. The very nature of a Baker Act involves the deprivation of an individual's liberty, especially when the deprivation of liberty is that of a child with developmental disabilities, who by statute is not subject to being Baker Acted due to his disability.

The fact the Sheriff's Office had no policies and provided no training as to providing accommodations to developmentally disabled children in the process of being Baker Acted, including modifications and accommodations when force, physical restrain, handcuffs, shackles is utilized in effectuating the Baker Act, establishes that the Sheriff's Office disregarded a strong likelihood that the failure to provide modifications and accommodations that would result in a violation of a federally protected right.

## VII. Conclusion

For the foregoing reasons, Plaintiff is entitled to summary judgment and respectfully requests that this Court find that:

    A. Deputy Smith is individually liable for the unlawful seizure of D.L.

B. The School District is liable for the unlawful seizure of D.L.;

C. Deputy Smith is individually liable for the use of excessive force against D.L.;

D. The School District is liable for violation of D.L.'s rights under the ADA;

E. The Hernando County Sheriff's Office is liable for violation of D. L's rights under the ADA.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via the Court's CM/ECF system on February 17, 2025 to:

Bobby G. Palmer, Jr.
Damon S. Starret
Hilyard, Bogan & Pamler, P. A.
1205 E. Robinson St.
Orlando, FL 32801
bpalmer@hilyardlawfirm.com

Richard Rosengarten
David M. Delaney
Tania Varela
Weiss Serota Helfman Cole + Bierman, P. L.

rrosengarten@wsh-law.com
ddelaney@wsh-law.com
tvarela@wsh-law.com

                              ROBERT BRUCE SNOW, P.A.

                              /S/ *Robert Bruce Snow*

                              _____
                              Robert Bruce Snow, Esquire
                              Florida Bar No.:  134742
                              112 North Orange Avenue
                              Brooksville, FL  34601
                              (352) 796-1441
                              law@rbsnowlaw.com
                              bsnow@rbsnowlaw.com
                              kseltzer@rbsnowlaw.com