UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

D.L., a minor, by and through his
next-of-friends, S.L. and R.L., mother
and father of the minor,

      Plaintiffs,

v.                                                                  Case No:  8:22-cv-00035-JLB-AEP

HERNANDO COUNTY SHERIFF'S
OFFICE, a public entity, DEPUTY
PAUL SMITH, School Resource
Officer, in his individual capacity, and
HERNANDO COUNTY SCHOOL
BOARD, a public entity,

      Defendants.

_____/

## ORDER

Plaintiff D.L., a minor, sues Defendants Hernando County Sheriff's Office

("HCSO"), Deputy Paul Smith, and the Hernando County School Board ("HCSB")

for Fourth Amendment violations as well as violations of Title II of the Americans

with Disabilities Act ("ADA").[1]  (Doc. 62).  The core of this case concerns Florida's

Baker Act Statute, which allows law enforcement to temporarily involuntary

commit an individual who is believed to be a danger to themselves and others.

---

[1] On its face, D.L.'s Second Amended Complaint brings claims against Deputy Smith and
Deputy Al Nienhuis in their official capacities.  (*See generally* Doc. 62).  However, the Court
previously dismissed the claims against Deputy Smith in his official capacity (Doc. 37 at
10), which D.L. accepts (Doc. 75 at 3–6; Doc. 77 at 4–5).  Likewise, any claims against
Deputy Nienhuis have previously been dismissed.  (Doc. 37 at 20–25; Doc. 75 at 6–7; Doc.
77 at 5–6).

*See* Fla. Stat. § 394.463.  D.L., HCSO, together with Deputy Smith, and HCSB have each filed motions for summary judgment.  (Docs. 134, 136, 144).  After careful review, the Court **GRANTS** summary judgment in favor of HCSO (Doc. 134) and HCSB (Doc. 136) and **DENIES** D.L.'s Motion (Doc. 144).[2]

## BACKGROUND

At the time of the incident from which the claims arise, D.L. was ten years old and in the fifth grade at Winding Waters Elementary School in the Hernando County School District.  (Doc. 62 at ¶ 26).  Winding Waters provides alternative education services for students with disabilities, such as D.L., who was diagnosed with non-communicative autism.  As part of his education plan, the school developed an Individualized Education Plan ("IEP") and Functional Behavioral Analysis ("FBA")/Behavioral Intervention Plan ("BIP").  (Doc. 136-4 at 61–62, 198–99; Doc. 134-4 at 293–325).  D.L.'s physician also diagnosed D.L. with Disruptive Behavior Disorder, noting that he presented defiant, oppositional, and aggressive behaviors.  (Doc. 134-7 at 41–54, 80–82).  Indeed, D.L. was known to have violent "meltdowns," both at home and at school.  (*Id.*).

On January 10, 2018, D.L. experienced a significant meltdown.  While in his classroom, D.L. became upset and acted out violently, throwing a chair.  (Doc. 136-5 at 39, 47–49, 152–53; *Classroom Video*, Doc. 142 at 9:15:30–9:16:30).[3]  Anthony

---

[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, providing that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

[3] D.L. disputes that he became upset in the classroom, threw a chair, and otherwise acted

Roberts, the paraprofessional assigned to D.L.'s classroom, escorted D.L. to a vacant
room to provide him "a quiet place to de-escalate," which was unsuccessful.  (Doc.
136-5 at 43).  In another attempt to de-escalate the situation with D.L., Mr. Roberts
then walked with him toward the playground.  (*Id.* at 48).  However, D.L. was
"continually becoming more agitated[.]"  (*Id.*)  Seeing this escalation, Mr. Roberts
and Jillian Minichino, the assistant principal, escorted D.L. to the office of Jennifer
DeArmas, the dean of students, in the hope of providing D.L. "a space of privacy" to
de-escalate his behavior.  (Doc. 136-5 at 49–50, 53).

　　　Throughout D.L.'s time in Ms. DeArmas's office, several school personnel
went in and out of the room.  Due to the large number of people involved and the
nature of the incident, the exact timeline of the specific events remains unclear.
What is clear, however, is that D.L. was inconsolable and violent toward himself

---

out.  (Doc. 173 at ¶ 4).  Specifically, D.L. argues that video of the classroom during the
incident does not depict such behavior.  The Court respectfully disagrees.  The video shows
D.L. becoming upset, banging on the bathroom door with his fists, and then throwing a
chair.  (*Classroom Video*, Doc. 142 at 9:15:30–9:16:30).  Later, D.L. goes into the corner of
the classroom where the camera does not record.  (*Id.* at 9:19:15–9:22:54).  Thus, there is no
genuine dispute of material fact as to whether D.L. became upset and acted out violently in
the classroom because video evidence depicts the behavior and D.L. has not offered evidence
to the contrary.  *See Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir.
2022) ("A genuine issue of material fact exists if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.") (quotation omitted); *see also Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (The opponent of a motion
for summary judgment "must do more than simply show that there is some metaphysical
doubt as to the material facts."); *see also Evanston Ins. Co. v. Via Ent., LLC*, No. 5:19-CV-
562-OC-30PRL, 2020 WL 5995665, at *4 (M.D. Fla. Oct. 6, 2020) (finding no genuine
dispute of material fact where defendant "d[id] not point the Court to any evidence that
would raise a genuine material dispute"); *see also U.S. ex rel. Barker v. Tidwell*, No. 4:12-
CV-108 CDL, 2015 WL 3505554, at *5 (M.D. Ga. June 3, 2015) ("Because [plaintiff] did not
point to *any* evidence to create a genuine fact dispute on this point, [defendant] is entitled
to summary judgment[.]").  In any event, this is not a material fact because none of D.L.'s
claims arise out of the events in the classroom.  (*See generally* Doc. 62).

and others.[4]  At first, in the office with D.L. were Mr. Roberts, Ms. DeArmas, Ms. Minichini, Lisa Castoria, an elementary assistant, and Maureen Castro, D.L.'s teacher.  (Doc. 136-3 at 47–52).  Ms. Castro observed D.L. crying on the floor with Mr. Roberts speaking to him in an attempt to calm him down.  (Doc. 136-3 at 52).  Instead, D.L. continued to cry and began kicking and waving his arms.  (Doc. 136-2 at 52).  Ms. Castro tried to subdue D.L., telling him that they would go to the playground, which was his "safe space," and tried breathing techniques with him— all to no avail.  (Doc. 136-3 at 59–61).

D.L. struck Mr. Roberts in the upper torso with a closed fist, struck Ms. Casto several times, and hit Ms. DeArmas with a closed fist.  (Doc. 136-2 at 70–74; Doc. 136-4 at 155).  D.L. began to bite himself on the arm and hit his head against the wall and the furniture "so hard it . . . sounded like . . . a watermelon hitting the ground."  (Doc. Doc. 136-2 at 72–74; Doc. 136-5 at 58–59, 94–95; Doc. 136-4 at 245).  D.L. then tried to push over a tall, freestanding wardrobe, but Ms. DeArmas caught it before it fell.  (Doc. 136-2 at 75–76).  Ms. Minichino tried to restrain D.L. using a "child pose," which restrains the child by crossing their arms against their torso.  (Doc. 136-2 at 77–79; Doc. 136-5 at 64).  D.L. struggled, trying to break free and

---

[4] D.L. disputes that he was violent and destructive in Ms. DeArmas's office.  (*See* Doc. 174 at ¶¶ 21–22, 31) (admitting that the deposition testimony is accurate but disputing its truth).  As previously explained, to rebut evidence on summary judgment, the opponent must do more than point to a "metaphysical doubt;" the opponent must point to evidence that raises a genuine dispute.  *See Matsushita*, 475 U.S. at 586; *see also Evanston Ins. Co.*, 2020 WL 5995665, at *4.  Here, D.L. points to no evidence that he was not violent in Ms. DeArmas's office.  He merely states that he lacked an injury to his head. (Doc. 174 at ¶ 31).  This is insufficient to raise a genuine dispute, especially because D.L. makes no effort to rebut the laundry list of other violent acts D.L. inflicted on himself and others.

eventually began to hit and kick Ms. Minichino.  (Doc. 136-2 at 77–79; Doc. 136-5 at 56, 66–68, 60–61; Doc. 136-4 at 154–55; Doc. 136-6 at 43, 47; Doc. 136-4 at 252).

At this point, Michelle Pearson, the behavioral specialist, entered the office to soothe D.L. by speaking calmly to him and offering him a sweater as a sensory item. (Doc. 136-9 at 38–39; Doc. 136-6 at 47–49).  In response, D.L. spat on Ms. Pearson. (Doc. 136-6 at 49).  Indeed, throughout most of his time in Ms. DeArmas's office, D.L. continuously kicked, spat, and struggled.  (Doc. 136-6 at 43–45; Doc. 136-8 at 39–42).

School personnel "feverishly tr[ied] to contact [D.L.'s] parents," calling repeatedly and leaving voicemails, but they did not respond.  (Doc. 136-8 at 103, 117–18).  When the parents eventually responded, they informed school personnel that they were not close to the school.  (*Id.*)

At some point, Deputy Smith, a law enforcement officer for HCSO working as the School Resource Officer ("SRO"), was called by school personnel to stand by. (Doc. 136-11 at 32; Doc. 136-4 at 159).  Deputy Smith arrived at Ms. DeArmas's office but did not enter.  (Doc. 136-11 at 32–34).  Instead, he observed D.L. from the windowpane of the office door.  (*Id.*).  Deputy Smith was aware that D.L. was autistic during his observation of and interactions with D.L.  (Doc. 134-1 at ¶ 17; Doc. 144-7 at 110).  Deputy Smith observed much of the previously described violent behavior, including D.L.'s attempt to overturn a wardrobe in Ms. DeArmas's office. (Doc. 144-7 at 39; Doc. 134-1 at ¶ 9).  Deputy Smith described D.L. as "acting erratic," "flopp[ing] himself on the floor," "throwing his fist, punching, kicking," and

"hitting other people." (Doc. 144-8 at 34, 39). Deputy Smith also saw D.L. grab pictures off the office wall and try to throw them before one of the school personnel intervened. (Doc. 144-7 at 122–23).

Deputy Smith observed Mr. Roberts attempt to restrain D.L.'s arms, but D.L. continued to kick his legs. (Doc. 144-7 at 50–51). In response, Deputy Smith stepped in to hold D.L.'s legs to "keep him from kicking, while school personnel used calming techniques. . . ." (Doc. 144-7 at 51; Doc. 134-1 at ¶ 9). This was unsuccessful because D.L. kept moving his legs back and forth to break free. (Doc. 144-8 at 44–45; Doc. 134-1 at ¶ 9). Deputy Smith left the room to call for additional deputies to assist. (Doc. 144-8 at 45–46; Doc. 134-1 at ¶ 10). At this point, Deputy Smith was "in the evaluation process of determining if [D.L.] got to the point to meeting the [Baker Act] criteria," but he was "giving the school an opportunity to try to use their techniques to calm him down. . . ." (Doc. 144-7 at 53). Deputy Smith walked back into the office, where Mr. Roberts was still holding onto D.L.'s arms while D.L. kicked. (Doc. 144-7 at 53–54; Doc. 134-1 at ¶ 10). After Deputy Smith observed D.L. bite himself on the arm and attempt to bite Mr. Roberts on the face, he determined that D.L. was a harm to himself and others such that he met the Baker Act criteria. (Doc. 144-7 at 53–54; Doc. 134-1 at ¶ 10). Because D.L. was still uncooperative and Mr. Roberts seemed to be getting tired, Deputy Smith stepped in to restrain D.L.'s arms. (Doc. 144-7 at 57; Doc. 134-1 at ¶ 10).

Shortly after Deputy Smith reentered Ms. DeArmas's office, Deputy Boylan arrived. (Doc. 144-7 at 55; Doc. 134-1 at ¶ 11). The deputies tried to talk to D.L.

6

and hold him so he could not continue to kick and hit them, but eventually they
decided that he needed to be restrained with handcuffs. (Doc. 144-7 at 58–59).
Deputy Pardue also arrived during this time, though it is unclear whether he
arrived before or after D.L. was handcuffed. (Doc. 134-6 at 20; Doc. 144-7 at 59–60).
When Deputy Pardue entered the office, he observed D.L. in a "very agitated" state,
"kicking and screaming," "headbutting . . . attempting to bite people . . . and
spitting. . . ." (Doc. 134-6 at 20–21). D.L. had shackles placed on his ankles to
prevent further fighting, though the deputies are unsure who placed them on D.L.
(Doc. 134-6 at 23–24; Doc. 144-8 at 53).

Leaving D.L. with Deputies Boylan and Pardue, Deputy Smith exited the
office to start the Baker Act paperwork. (Doc. 144-7 at 60). In the Report of Law
Enforcement Officer Initiating Involuntary Examination (the "Report"), Deputy
Smith noted that D.L. was "unable to determine for himself . . . whether
examination is necessary" and that "[t]here is a substantial likelihood that without
care or treatment [D.L.] will cause serious bodily harm" to himself and others. (Doc.
144-9) (citing Fla. Stat. § 394.463).

Deputies Boylan and Pardue carried D.L. from Ms. DeArmas's office to the
patrol vehicle and transported him to the hospital, where his mother was waiting.
(Doc. 134-6 at 27–28; Doc. 134-1 at ¶ 12; Doc. 162-8 at 77–78). D.L. spent two days
at the hospital for "mood stabilization." (Doc. 162-1 at 34). The intake physician
completed a medical report, noting that D.L. had severe school difficulties, that his
behavior required 24-hour monitoring and assessment, and that he was irritable

7

and hostile.  (*Id.* at 13, 17, 31).  The medical report also notes bruising on D.L.'s arms and ankles but found no other injury.  (*Id.* at 6, 25).

Before the Court is D.L.'s Second Amended Complaint, bringing Fourth Amendment unreasonable seizure and excessive force claims against Deputy Smith, Title II ADA claims against HCSO and HCSB, and an unreasonable seizure claim against HCSB.  (Doc. 62).  The HCSO, with Deputy Smith, filed a Motion for Summary Judgment (Doc. 134), as did the HCSB (Doc. 136).  D.L. responded (Doc. 161; Doc. 160), and HCSO and HCSB replied (Doc. 166; Doc. 165).  D.L. filed a Motion for Summary Judgment (Doc. 144).  HCSO and HCSB each responded (Doc. 157; Doc. 159) and D.L. replied (Doc. 167; Doc. 168).[5]

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one that "might affect the outcome of the suit under the governing law."  *Id.*  "[A] mere scintilla of evidence" does not create a genuine issue of material fact, so a nonmoving party may not simply state that "the jury might, and legally could, disbelieve the moving party's evidence."

---

[5] Because D.L. did not respond to either HCSO's or HCSB's statement of material facts contained in their motions for summary judgment, the Court provided D.L. leave to do so, (Doc. 171; Doc. 172) and he responded (Doc. 177; Doc. 178).  The Court likewise provided D.L. leave to file his own statement of material facts for his summary judgment motion (Doc. 179), which he then filed (Doc. 180), and the Court permitted HCSO and HCSB to respond (*see* Doc. 182; Doc. 183).

*Hinson v. Bias*, 927 F.3d 1103, 1115–16 (11th Cir. 2019) (citation and internal

quotation marks omitted).

Courts may not make credibility determinations or weigh the evidence when

reviewing the record. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir.

2010) ("On summary judgment . . . [n]either [the Eleventh Circuit] nor the district

court are to undertake credibility determinations or weigh the evidence.").  Instead,

courts view evidence and draw all reasonable inferences in the nonmoving party's

favor. *Rojas v. Florida*, 285 F.3d 1339, 1341–42 (11th Cir. 2002).  But "an inference

is not reasonable if it is 'only a guess or a possibility,' for such an inference is not

based on the evidence but is pure conjecture and speculation." *Daniels v. Twin

Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1982).  In sum, the ultimate

question for the Court on summary judgment is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

When there are cross-motions for summary judgment, granting summary

judgment is appropriate where "one of the parties is entitled to judgment as a

matter of law on facts that are not genuinely disputed. . . ." *United States v. Oakley*,

744 F.2d 1553, 1555–56 (11th Cir. 1984) (citation omitted); *Bulle v. Nat'l Fire &

Marine Ins. Co.*, 653 F. Supp. 3d 1159, 1165 (M.D. Fla. 2023) ("The standard of

review for cross-motions for summary judgment does not differ from the standard

applied when only one party files a motion, but simply requires a determination of

whether either of the parties deserves judgment as a matter of law on the facts that

are not disputed.").

## DISCUSSION

In his Second Amended Complaint, D.L. brings five counts against
Defendants, alleging Fourth Amendment and ADA violations.  (Doc. 62).  After
careful consideration, the Court finds that none of D.L.'s claims survive summary
judgment.

### I.     The claims against Deputy Smith and HCSO fail.

Count I of the Second Amended Complaint is an unreasonable seizure and
excessive force claims against Deputy Smith.  (Doc. 62 at ¶¶ 36–43).  Specifically,
D.L. alleges that Deputy Smith unreasonably seized him under the Baker Act and
used excessive force in restraining him.  (*Id.*).  Count II is an ADA violation claim
against HCSO, alleging failure to accommodate.  (Doc. 62 at ¶¶ 44–51).  Upon
careful review of the parties' briefing and the record, the Court agrees with Deputy
Smith that he is entitled to qualified immunity on both claims and finds that HCSO
did not violate the ADA.

### A. Deputy Smith is entitled to qualified immunity on both Fourth Amendment claims.

Under the qualified immunity doctrine, "government officials performing
discretionary functions generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have known."  *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982).  To be entitled to qualified immunity, the
officer "must first prove that he was acting within the scope of his discretionary

authority when the allegedly wrongful acts occurred." *Bates v. Harvey*, 518 F.3d

1233, 1242 (11th Cir. 2008) (internal quotation marks and citation omitted).

Once the officer establishes that he acted within his discretionary authority,

the burden shifts to the plaintiff to show that qualified immunity is inapplicable.

*Maddox v. Stephens*, 727 F.3d 1109, 1120 (11th Cir. 2013).  To do so, the plaintiff

must show (1) "that the defendant violated h[is] constitutional rights, and (2) that,

at the time of the violation, those rights were 'clearly established . . . in light of the

specific context of the case, not as a broad general proposition[.]'" *Gaines v.

Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017) (quoting *Saucier v. Katz*, 533 U.S.

194, 201 (2001)).

> ### i.  Deputy Smith is entitled to qualified immunity as to the unreasonable seizure claim.

> #### a.  Deputy Smith acted within his scope of discretionary authority.

In assessing whether an officer acted within his scope of discretionary

authority, the Court utilizes a two-part inquiry asking, "whether the government

employee was (a) performing a legitimate job-related function (that is, pursuing a

job-related goal), (b) through means that were within his power to utilize."

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

In his response to Defendants' motion for summary judgment, D.L. argues

that Deputy Smith was not acting within his discretionary authority as law

enforcement any time prior to deciding to commit D.L. involuntarily.  (Doc. 161 at

8–9).  That is, D.L. argues that Deputy Smith was acting in his capacity as an SRO

when he entered the office to restrain D.L.'s feet.[6]  (*Id.* at 7–9).

D.L. relies on Florida Statute § 1006.12(1)(b) to essentially argue that the
duties of an SRO and a law enforcement officer are severable.  (Doc. 161 at 8).
Specifically, D.L. argues that section 1006.12(1)(b), which provides that "[s]chool
resource officers shall abide by district school board policies and shall consult with
and coordinate activities through the school principal, but shall be responsible to
the law enforcement agency in all matters relating to employment," means Deputy
Smith was acting as school personnel when he held D.L.'s feet before exiting the
room to call more deputies but acted as a law enforcement office once he decided to
Baker Act D.L.  (*Id.* at 7–9).

This overlooks that SROs *are* certified law enforcement officers.  In fact, the
same statute specifies that "[t]he powers and duties of a law enforcement officer
shall continue throughout the employee's tenure as a school resource officer."  Fla.
Stat. § 1006.12(1)(a).  The fact that section 1006.12(1)(b) allows law enforcement
officers to work as SROs "under cooperative agreements" between their law
enforcement agency and the school board does not mean that the SRO cannot
simultaneously act as law enforcement while performing his duties as an SRO.

D.L.'s argument hinges on Deputy Smith's alleged use of ADA de-escalation
and calming techniques.  (Doc. 161 at 7) (citing Doc. 134-1 at ¶ 4; Doc. 144-7 at 40,
51–52).  Deputy Smith's affidavit establishes that "[a]t all material times, [he] was
on duty . . . and was engaged in the legal and lawful execution of [his] duties as a

---

[6] But D.L.'s Motion for Summary Judgment does not challenge Deputy Smith's actions as
being outside of his discretionary authority.  (Doc. 144 at 11–15).

Deputy Sheriff. . . ." (Doc. 134-1 at ¶ 4). Though Deputy Smith testified that he "went in [Ms. De Armis's office] . . . to assist Mr. Roberts in trying to calm him down and [he] held onto [D.L.'s] feet just to keep him from kicking," this does not show that he was participating in ADA calming techniques prescribed by D.L.'s IEP or BIP. (Doc. 144-7 at 40). Instead, he "held onto D.L.'s feet just to keep him from kicking, while *school personnel* used calming techniques. . . ." (Doc. 134-1 at ¶ 9) (emphasis added). Thus, even when viewed in light most favorable to D.L., there is no genuine issue of material fact as to whether Deputy Smith acted within his discretionary authority when he restrained D.L.'s feet. *See J.I.W. by & through T.W. v. Dorminey*, No. 21-12330, 2022 WL 17351654, at *5 (11th Cir. Dec. 1, 2022) (holding that an SRO was entitled to qualified immunity where, as part of his discretionary authority, the SRO "grabbed [the student plaintiff] by the arm, directed him away from [another student], and held him there").

D.L. fails to explain or provide supporting caselaw for this arbitrary boundary between what constitutes law enforcement action and what constitutes school employee action. Presumably, Plaintiff argues that Deputy Smith's decision to Baker Act D.L. signals some switch into law enforcement mode because Deputy Smith was the only person present with the authority to enforce the Baker Act. (Doc. 144-7 at 152). However, this ignores the fact that Deputy Smith "had not made the decision as to whether D.L. met the criteria" for involuntary examination under the Baker Act when he held D.L.'s feet. (Doc. 144-7 at 53). Deputy Smith was "still in the evaluation process of determining if he got to the point of meeting

13

the criteria" for a Baker Act during his initial observation and interaction with D.L. (Doc. 144-7 at 52–53). He testified that, while evaluating whether D.L. met the criteria for the Baker Act, he "was giving the school an opportunity to try to use their techniques to calm him down" and "looking for . . . the point where . . . [D.L.] was starting to harm himself." (*Id.* at 53). After observing D.L. bite himself and attempt to bite Mr. Roberts, Deputy Smith determined that D.L. met the Baker Act criteria. (*Id.* at 53–54). In other words, throughout his interaction with D.L., Deputy Smith was assessing the severity of D.L.'s behavior for involuntary commitment as a law enforcement officer.

### b. D.L. has not met his burden to show Deputy Smith unreasonably seized him under the Baker Act.

The Fourth Amendment protects against unreasonable seizure. *Roberts v. Spielman*, 643 F.3d 899, 905 (11th Cir. 2011); U.S. Const. amend. IV. "Mental-health seizures are reasonable under the Fourth Amendment when the officer has probable cause to believe that the seized person is a danger to himself or to others." *Ingram v. Kubik*, 30 F.4th 1241, 1250 (11th Cir. 2022). "Even if probable cause is lacking, officers are entitled to qualified immunity if they have *arguable* probable cause." *Watkins v. Bigwood*, No. 22-10875, 2023 WL 3711827, at *3 (11th Cir. May 30, 2023) (emphasis in original) (citing *Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1319 (11th Cir. 2016)).

In the Baker Act context, "[a]rgubable probable cause exists if a reasonable officer, knowing the information [the officer] possessed, could have believed that

probable cause existed to involuntarily commit [the plaintiff]." *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1126 (11th Cir. 2021). The Court "must look to the totality of the circumstances to determine whether arguable probable cause existed to detain [D.L.] under Florida's Baker Act." *Id.* at 1126. Florida's Baker Act statute provides:

> A person may be taken to a receiving facility for involuntary examination if there is reason to believe that the person has a mental illness and because of his or her mental illness . . . [t]he person is unable to determine for himself or herself whether examination is necessary; and . . . [t]here is a substantial likelihood that without care or treatment the person will cause serious bodily harm to himself or herself or others in the near future, as evidenced by recent behavior.

Fla. Stat. § 394.463(1). Put simply, in the context of this case, the Baker Act statute requires: (1) reason to believe the person has a mental illness and (2) because of the mental illness, there is a substantial likelihood the person will cause serious bodily harm to themselves or others.

Florida Statutes define mental illness as "an impairment of the mental or emotional processes that exercise conscious control of one's actions or of the ability to perceive or understand reality, which impairment substantially interferes with the person's ability to meet the ordinary demands of living." Fla. Stat. § 394.455(29). Developmental disabilities, such as autism, are not included in the definition of mental illness. *Id.*; Fla. Stat. § 393.063(5).

D.L. argues that "Deputy Smith knew . . . that D.L. had . . . autism . . . and therefore did not have probable cause to believe D.L. had a mental illness." (Doc. 144 at 11–13). In support, D.L. relies on the Report completed by Deputy Smith.

15

(Doc. 144-9). The Report, which provides the definition of mental illness, demonstrates that Deputy Smith believed D.L. was suffering from a mental illness, rendering D.L. unable to determine whether examination is necessary and that, without treatment, there was a substantial likelihood that D.L. would cause serious bodily harm to himself or others. *Id.* Deputy Smith described D.L.'s behavior, writing, "[D.L.] has autism and was having an episode. [D.L.] became enraged and started hitting and kicking teachers. Several teacher[s] made an attempt to ca[lm] him down and were unsuccessful. [D.L.] began to throw pict[ur]e frames at teachers and tried biting t[he]m. [D.L.] then began to bite himself." *Id.*

But an autism diagnosis does not foreclose the possibility of a mental illness. In fact, this was Deputy Smith's concern given the severity of D.L.'s behavior—that, in addition to his autistic behaviors, D.L. was exhibiting behaviors stemming from a mental illness. (Doc. 134-1 at ¶¶ 17–18). Throughout Deputy Smith's evaluation, he witnessed D.L. behaving inconsolably, hitting, kicking, punching, and attempting to knock over heavy furniture. (Doc. 144-7 at 39, 122–23; Doc. 134-1 at ¶ 9). Though Deputy Smith was aware of D.L.'s autism diagnosis, the record demonstrates that he did not know whether such violent behavior was normal behavior for an autistic child. (Doc. 144-8 at 35–36). Because of the severity of D.L.'s behavior, Deputy Smith believed him to be exhibiting signs of a mental illness in addition to the autistic behavior. (Doc. 134-1 at ¶¶ 17–18; Doc. 144-7 at 110–12). As Deputy Smith would later learn, D.L. *had* been diagnosed with Disruptive Behavior Disorder

for exhibiting aggressive and hostile behaviors.[7]  (Doc. 134-7 at 41–54, 80–82; Doc. 134-1 at ¶ 17).

Further, though D.L. insists that it was widely known that his "tantrums" were due to his autism, D.L. had never displayed such severe behavior prior to January 10, 2018.  (Doc. 161 at 15); (Doc. 144-7 at 54) (Deputy Smith describing D.L.'s behavior as "out of control"); (Doc. 136-5 at 57, 66) (Ms. Minichino testifying that D.L.'s behavior was "more escalated and aggressive than [she]'d ever seen" and "out of control"); (Doc. 136-3 at 62) (Ms. Castro testifying that she "do[esn]'t remember ever seeing [D.L.] like that before.  [She didn't] have a recollection of him being like that before this incident . . . . [I]t was uncontrollable"); (Doc.136-8 at 42) (Ms. Cerro describing D.L. as "out of control").  Indeed, medical records submitted by D.L. confirm that his mother informed physicians that biting was a new behavior.  (Doc. 162-1 at 13).

D.L. relies on the expert report of Daniel Losey, a former law enforcement officer and prosecutor, finding that no reasonable officer would have involuntarily committed D.L. under these circumstances.  (Doc. 162-12 at 10–13).  The Court is unconvinced.  Mr. Losey merely regurgitates D.L.'s argument: that, because D.L. has autism, there was no basis for probable cause that D.L. also suffered from mental illness.

---

[7] Disruptive behavior disorder is characterized by "defiant," "oppositional," and "aggressive behaviors."  (Doc. 134-7 at 81).  D.L.'s physician diagnosed him with the disorder in part because of "consistent complaint[s]" of his "physical aggression toward others, constituting a threat to others' safety."  (*Id.* at 82–83).  Indeed, a "core complaint" was D.L.'s physical aggression at school.  (*Id.* at 32).

That said, even viewed in the light most favorable to D.L., the totality of the

circumstances demonstrates that Deputy Smith had arguable probable cause to

believe D.L. was suffering from a mental illness in addition to his autism diagnosis.

D.L. next argues that Deputy Smith lacked probable cause to believe that

there was a substantial likelihood that D.L. would cause "serious bodily harm to

himself . . . or others in the near future" based on D.L.'s behavior. (Doc. 161 at 11–

12; Doc. 144 at 13–15); Fla. Stat. § 394.463(1).  First, D.L. emphasizes that neither

he nor the school's staff suffered serious harm.  (Doc. 161 at 11–12; Doc. 144 at 13).

But that is not the standard; rather, the proper inquiry is whether, based on D.L.'s

recent behaviors, there is a substantial *likelihood* that he *will* cause serious harm to

himself or others *in the near future*.  *See* Fla. Stat. § 394.463(1).

"Relevant recent behavior may include 'causing, attempting, or threatening

to do [serious bodily] harm.'"  *Watkins v. Bigwood*, No. 22-10875, 2023 WL 3711827,

at *3 (11th Cir. May 30, 2023) (alterations in original) (quoting *D.F. v. State*, 248 So.

3d 1232, 1234 (Fla. 5th DCA 2018)).  As previously described, D.L.'s recent

behaviors included attempting to knock over a large piece of furniture, kicking,

biting, punching, hitting his head on the wall and furniture, throwing objects, and

more.  (Doc. 144-7 at 39, 122–23; Doc. 134-1 at ¶ 9; Doc. 136-4 at 252–56; Doc. 136-5

at 55–62, 219; Doc. 136-2 at 72–79).   The Court finds that a reasonable officer

observing these behaviors could believe that D.L. was substantially likely to cause

serious harm to himself or others.

Accordingly, D.L. has not shown that Deputy Smith violated a constitutional

right.  Finding otherwise would require him to show that *no* reasonable officer in

Deputy Smith's position would have involuntarily committed D.L.  *See, e.g.*, *Garcia*

*v. Killingsworth*, 425 F. App'x 831, 832 (11th Cir. 2011) (affirming the district

court's decision finding that the officer was entitled to qualified immunity on the

plaintiff's unreasonable seizure claim because the plaintiff "did not establish that no

reasonable officer could have thought there was probable cause to arrest him");

*Festa v. Santa Rosa Cnty. Fla.*, 413 F. App'x 182, 185 (11th Cir. 2011) ("If it would

be clear to any reasonable officer in the same situation that his actions were

unconstitutional, then qualified immunity is not available, but if 'officers of

reasonable competence could disagree on th[e] issue, immunity should be

recognized.'") (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### c.  D.L. has failed to show Deputy Smith violated a clearly established right.

Even had D.L. sufficiently argued that Deputy Smith violated D.L.'s

constitutional right to be free from unreasonable seizure, he has failed to show that

the right was clearly established.  "A right is clearly established when it is

'sufficiently clear that every reasonable official would have understood that what he

is doing violates that right.'" *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273

(11th Cir. 2021) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  "When we

consider whether the law clearly established the relevant conduct as a

constitutional violation at the time that Defendant Officers engaged in the

challenged acts, we look for 'fair warning' to officers that the conduct at issue

violated a constitutional right." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir.

2017) (citation omitted).  "In this circuit, the law can be 'clearly established' for
qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh
Circuit Court of Appeals, or the highest court of the state where the case arose."
*Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 827 n.4 (11th Cir.
1997) (citation omitted).

A plaintiff may establish that an officer had fair warning in one of three
ways.  *Jones*, 857 F.3d at 851–52; *Gaines*, 871 F.3d at 1208.  First, the plaintiffs
"may point to binding precedent that is materially similar."  *Jones*, 857 F.3d at 852.
While the Court "do[es] not require a case directly on point, . . . existing precedent
must have placed the statutory or constitutional question beyond debate."
*Mullenix*, 577 U.S. at 11 (citation omitted).  Thus, the Court must "consider
'whether the factual scenario that the official faced is fairly distinguishable from the
circumstances facing a government official in a previous case.'"  *Jones*, 857 F.3d at
852 (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012)).  Second,
the plaintiffs may "point to a broader, clearly established principle that should
control the novel facts of the situation."  *Gaines*, 871 F.3d at 1208–09 (quoting
*Terrell v. Smith*, 668 F.3d 1244, 1255–56 (11th Cir. 2012)).  Third, "the conduct
involved . . . may so obviously violate the constitution that prior case law is
unnecessary."  *Id.*

Here, D.L. fails to provide any argument that his constitutional right not to
be seized under the Baker Act was clearly established.  (*See generally* Doc. 144; Doc.
161).  D.L.'s response to HCSO's Motion for Summary Judgment argues only that

20

Deputy Smith's use of *excessive force*—not unreasonable seizure—constitutes a violation of clearly established law. (*See* Doc. 161). Likewise, D.L.'s own summary judgment motion fails to discuss whether *any* right was clearly established—unreasonable seizure or otherwise. (*See* Doc. 144). Not until his reply does D.L. take up the argument—but, again, only as to the excessive force claim. (Doc. 144 at 5–6). Nowhere does D.L. attempt to argue that Deputy Smith violated a clearly established right as it relates to the unreasonable seizure claim. On this basis alone, D.L. has not met his burden to refute Deputy Smith's entitlement to qualified immunity as to unreasonable seizure. *Gaines*, 871 F.3d at 1208 (holding that, for purposes of qualified immunity, it is the plaintiff's burden to show that the defendant violated a constitutional right that was clearly established); *see Jones*, 857 F.3d at 851 ("[T]o survive a qualified-immunity defense, [the plaintiff] must satisfy *both* showings.") (emphasis added).

Even construing D.L.'s caselaw on excessive force as relevant to the unreasonable seizure claim, he cannot demonstrate that any alleged unreasonable seizure was a violation of a clearly established right. In arguing that materially similar caselaw exists to put Deputy Smith on notice of a clearly established right, D.L. relies on *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306 (11th Cir. 2006) and *Figueroa v. Santa Rosa Cnty. Sheriff's Dep't*, 721 F. Supp. 3d 1289, 1301 (N.D. Fla. 2024). (Doc. 168 at 6; Doc. 161 at 17). Neither case is instructive here.

In *Gray*, a school coach told the student plaintiff to stand by the wall of the gym after the plaintiff refused to participate in the class. *Gray*, 458 F.3d at 1300.

Though the plaintiff complied, she threatened to hit the coach as she walked toward

the wall.  *Id.*  After hearing the plaintiff make the threat, another coach directed

her to approach.  *Id.* at 1301.  The school's SRO witnessed these exchanges and

insisted that he handle the plaintiff, directing her to put her hands behind her back.

The SRO handcuffed her, tightening them until it caused her pain.  *Id.*  Keeping the

plaintiff restrained, the SRO told her, "[T]his is how it feels to be in jail."  *Id.*

(alteration in original).  In discovery responses, the SRO explained that he detained

and handcuffed the plaintiff "to impress upon her the serious nature of committing

crimes that can lead to arrest, detention or incarceration."  *Id.*  at 1301–02.  The

*Gray* Court emphasized that "[t]he problem in this case for [the SRO] is that, at the

time [he] handcuffed [the plaintiff], there was no indication of a potential threat to

anyone's safety.  The incident was over, and [the plaintiff] . . . had promptly

complied with the teachers' instructions. . . ."  *Id.* at 1306.

    In *Figueroa*, a case not binding on this Court, one of the plaintiffs was an

eight-year-old child diagnosed with autism, disruptive mood dysregulation disorder,

and attention deficit hyperactivity disorder.  *Figueroa*, 721 F. Supp. 3d at 1297.

The plaintiff became upset in his classroom and hit two students and a teacher.  *Id.*

He was removed from the classroom and taken to a "Serenity Room."  *Id.*  When the

SRO arrived at the room, the plaintiff was pedaling on a stationary bicycle.  *Id.*  The

plaintiff "remained calm and compliant."  *Id.*  Yet, the SRO grabbed the plaintiff,

placed his hands behind his back, and took him down to the floor.  *Id.*  The SRO

handcuffed the plaintiff with his knee on the plaintiff's back while the plaintiff cried

in pain. *Id.* At the time, the SRO told the plaintiff that he knew the handcuffs were not meant for children, so he had to tighten them to fit the plaintiff's wrist. *Id.* The *Figueroa* court noted that the plaintiff "made no overt action to harm himself or [the SRO] at any time." *Id.* The court also noted that, when the SRO arrived at the serenity room, the plaintiff "was engaged in de-escalation by quietly pedaling on a stationary bicycle." *Id.* at 1300.

Similarly, the other plaintiff in *Figueroa* was a ten-year-old child diagnosed with autism and attention deficit hyperactivity disorder. *Id.* at 1298. The plaintiff was removed from his classroom after striking and throwing water on his teacher. *Id.* He was placed in the school's serenity room, where he punched a hole in the wall. *Id.* The SRO arrived and observed the plaintiff attempting to fix the hole in the wall for several minutes. *Id.* When the plaintiff tried to leave the room, the SRO pushed him away. *Id.* The plaintiff then walked toward the back of the room, and the SRO told him "when I'm involved, things change." *Id.* The SRO then grabbed the plaintiff, turned him around, and handcuffed him. *Id.* The plaintiff "made no attempt to flee, hit, or resist [the SRO] as he approached." *Id.* After telling a nearby employee that he was going to Baker Act the plaintiff, the SRO walked him through the school to his patrol vehicle. *Id.* Again, the plaintiff "did not cry, scream, resist, or make any attempt to flee during the walk." *Id.*

The circumstances of *Gray* and *Figueroa* are significantly distinguishable from the facts here. In both cases, the plaintiffs were not violent (or were even calm) after being removed from the classroom. Here, D.L. had not calmed down and

was continuously displaying severely violent behavior toward himself and others.
Moreover, *Gray* and *Figueroa* dealt with circumstances where the SRO was acting
to punish the plaintiff.  *See Gray* 458 F.3d at 1307 ([The SRO]'s purpose in
handcuffing [the plaintiff] was simply to punish her. . . ."); *Figueroa*, 721 F. Supp.
3d at 1303–04 ("[I]t is reasonable, for purposes of [the] motion to dismiss, to infer
that [the SRO]'s purpose in seizing [the plaintiff] was punitive.").  Here, there is no
indication or evidence that Deputy Smith decided to Baker Act D.L. for punitive
purposes.  Because these cases are factually and legally distinguishable, they could
not have provided Deputy Smith fair warning of any violation of a clearly
established constitutional right.

This leaves D.L. with the second and third methods of showing a clearly
established constitutional right, "generally known as 'obvious clarity' cases."
*Gaines*, 871 F.3d at 1209.  "They exist where the words of the federal statute or
constitutional provision at issue are so clear and the conduct so bad that case law is
not needed to establish that the conduct cannot be lawful."  *Id.* (citation and
internal quotation marks omitted).  Again, D.L. has failed to provide any argument
that these methods apply to the alleged unreasonable seizure.  (*See generally* Doc.
144; Doc. 168; Doc. 161).  In any event, D.L.'s clearly established argument for
excessive force relies only on the first method—demonstrating fair notice through a
materially similar case.  (Doc. 161 at 17–19; Doc. 168 at 6).  Indeed, the closest D.L.
comes to any argument that the second or third methods apply is to say, in a
conclusory fashion, that "the unique facts of this case fall into the other categories

that show a constitutional right was clearly established. . . ." (Doc. 168 at 6).

Even assuming, *arguendo*, that D.L. did assert that the alleged unreasonable seizure violated a clearly established right through the obvious clarity methods, Deputy Smith's actions were not so egregious as not to require notice through caselaw. Finding otherwise requires exceptionally rare circumstances. *See Santamorena v. Georgia Military College*, 147 F.3d 1337, 1340 n.6 (11th Cir. 1998) ("these exceptional cases rarely arise"); *Coffin v. Brandau*, 642 F.3d 999, 1015 (11th Cir. 2011) ("Our case law has made clear that 'obvious clarity' cases will be rare."). Moreover, the broader principle relied on by *Figueroa* and established by *Gray* is irrelevant here. The "principle identified by the Eleventh Circuit in *Gray* is that an officer violates the Constitution when he handcuffs a child who poses no physical threat purely to teach that child a lesson." *Figueroa*, 435 F. Supp. 3d at 1302–03 (citing *Gray*, 458 F.3d at 1307).

Accordingly, the Court finds that Deputy Smith is entitled to qualified immunity as to the unreasonable seizure claim.

### ii. Deputy Smith is entitled to qualified immunity as to the excessive force claim.

Because Deputy Smith was acting within his discretionary authority throughout his interaction with D.L., the burden shifts to D.L. to show that he is not entitled to qualified immunity on the excessive force claim. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009); *see Gaines*, 871 F.3d at 1208 (explaining that the plaintiff must show that the officer violated a constitutional right that was clearly established to defeat a qualified immunity

25

defense).

"A determination that an officer used excessive force 'requires careful attention to the facts and circumstances of each particular case' while 'recogniz[ing] that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Ingram*, 30 F.4th at 1251 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  Even though they do not involve criminal arrest, courts apply the *Graham* framework to mental health seizures.  *Id.* (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005)).  "Under that framework, the force used by an officer is reasonable only if it is 'reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer [or others], and the risk of flight.'"  *Id.* (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)).  The Court "also considers the need for application of force, the relationship between the need and amount of force used, and the extent of the injury inflicted by the arresting officer."  *Id.* (quoting *Helm v. Rainbow City, Alabama*, 989 F.3d 1265, 1273 (11th Cir. 2021) (citation omitted)).

Here, D.L. alleges that Deputy Smith used excessive force when he physically restrained D.L. by holding his feet and arms, handcuffing his hands, and shackling his ankles.  (Doc. 144 at 18–19; Doc. 161 at 18–19).  D.L. further asserts that he sustained bruising and lacerations on his wrists and ankles as a result of the physical restraints and from being carried to the patrol vehicle and transported to the hospital while restrained.  (Doc. 161 at 19) (citing Doc. 162-8 at 75–77).

D.L.'s claims of excessive force as to being placed in handcuffs and ankle shackles, restrained while carried and transported, and the alleged resulting injuries are unpersuasive.  Even when viewed most favorably to D.L., there is no evidence that Deputy Smith was responsible for these events.  The only support D.L. provides that Deputy Smith placed the ankle restraints on D.L. is Deputy Pardue's police report, which states "I assisted Deputy Boylan and Deputy Smith with [D.L.'s] ankles to prevent further harm to himself and others."  (Doc. 162-5).  However, Deputy Pardue testified that his report refers to the fact that he assisted with holding D.L.'s ankles—not with placing shackles on D.L.  (Doc. 134-6 at 78).  Additionally, Deputy Smith testified that he did not place the shackles on D.L.  (Doc. 144-8 at 52–53; Doc. 134-1 at ¶ 11).  Thus, D.L. cannot show that Deputy Smith shackled D.L.'s ankles or was responsible for the resulting injuries.

Likewise, there is no evidence that Deputy Smith carried D.L. to the patrol vehicle or transported him to the hospital while restrained.  In fact, D.L. admitted in his response to HCSO's statement of material facts that Deputy Smith did *not* carry or transport D.L.  (Doc. 134 at ¶ 45; Doc. 173 at ¶ 45).  Indeed, Deputy Smith's affidavit states that "I did not remove D.L. from Winding Water School, nor did I transport D.L. to a mental health facility on January 10, 2018."  (Doc. 134-1 at ¶ 12).  Additionally, both Deputy Smith and Deputy Pardue testified that it was Deputies Pardue and Boylan who removed D.L. from the school and transported him to the hospital.  (Doc. 162-3 at 54, 85; Doc. 162-4 at 61; Doc. 134-6 at 85).  Video evidence corroborates this testimony.  (*Front Reception Video*, Doc. 142 at 11:39:30–

11:39:45).  Accordingly, D.L. has not presented sufficient evidence for the claim that Deputy Smith used excessive force in carrying and transporting D.L. while restrained.

To prove excessive force, then, D.L. must do so through Deputy Smith's restraint of his feet and arms or through the use of handcuffs.  First, D.L.'s argument that Deputy Smith's use of force was excessive in holding D.L.'s feet and arms fails.  The Court must determine whether "the force used by an officer" was "reasonably proportionate to the need for that force."  *Ingram*, 30 F. 4th at 1251 (citation omitted).  Here, Deputy Smith restrained D.L.'s feet because D.L. continued to kick his legs while Mr. Roberts restrained his arms.  (Doc. 134-1 at ¶ 9; Doc. 144-7 at 50–51).  After Deputy Smith stepped away, D.L. continued to kick and bite himself on the arm and attempted to bite Mr. Roberts's face.  (Doc. 144-7 at 53–54; Doc. 134-1 at ¶ 10).  Mr. Roberts moved away from D.L. and Deputy Smith took over to restrain his arms.  (Doc. 144-7 at 57; Doc. 134-1 at ¶ 10).  Given D.L.'s violent behavior, Deputy Smith used reasonable force in restraining D.L.'s feet and arms in an effort to prevent self-inflicted injury or injury to others.  *See Dorminey*, 2022 WL 17351654, at *5–6 (agreeing with the district court's finding that the SRO's use of force was justified where the SRO grabbed a student by the arm to direct him away from someone else after observing the student's violent and aggressive behavior).

Likewise, D.L.'s argument that Deputy Smith used excessive force by handcuffing D.L. is unpersuasive.  Neither Deputy Smith nor Deputy Pardue can

recall who placed D.L. in handcuffs.  (Doc. 144-7 at 58–59; Doc. 134-1 at ¶ 11; Doc.
134-6 at 18).  Even assuming Deputy Smith placed the handcuffs on D.L., the Court
finds that this does not constitute excessive force.  Without citing to any evidence,
D.L. argues that he was "physically controlled" prior to being placed in handcuffs.
(Doc. 144 at 18).  This is not supported by the record.  Deputy Pardue testified that
the decision was made to handcuff D.L. "because [he] was biting. . . ."  (Doc. 134-6 at
24).  Deputy Smith testified that D.L. remained "out of control" when he and Mr.
Roberts attempted to restrain him, noting that D.L. was "still kicking his legs,
trying to break free from Mr. Roberts." (Doc. 162-4 at 52).  Thus, D.L. was resisting
any efforts made by the deputies to restrain him at the time he was handcuffed.

Additionally, D.L.'s contention that the handcuffs caused lacerations and
bruising and, consequently, constitute excessive force falls short.  An officer's right
to make a mental health seizure "necessarily carries with it the right to use some
degree of physical coercion or threat thereof to effect it."  *Ingram*, F.4th at 1251
(quoting *Graham*, 490 U.S. at 396).  The sole evidence provided that D.L. sustained
lacerations to his wrists is the testimony of his mother, who testified that she did
not personally witness how D.L. sustained any of his alleged injuries.  (Doc. 162-8 at
75).  While medical records provided by D.L. confirm that he sustained bruising on
his wrists, they make no notation of lacerations.  (Doc. 163-1 at 6).  Even assuming
D.L. did have lacerations, however, this does not rise to the level of excessive force.

"Painful handcuffing, without more, is not excessive force in cases where the
resulting injuries are minimal." *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th

Cir. 2002); *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("[O]nly the

most exceptional circumstances will permit an excessive force claim on the basis of

handcuffing alone."). Here, D.L. did not require or seek medical treatment for the

injuries to his wrists, and there is no evidence of a lasting injury. *See Gold v. City of

Miami*, 121 F.3d 1442, 1446–47 (11th Cir. 1997) (holding that the officer did not use

excessive force in handcuffing the plaintiff where the plaintiff "experienced pain

from the handcuffs for roughly twenty minutes and that Gold suffered only skin

abrasions for which he did not seek medical treatment"); *Nolin v. Isbell*, 207 F.3d

1253, 1258 n.4 (11th Cir. 2000) (holding that the officer did not use excessive force

in handcuffing the appellee where he "had minor bruising which quickly

disappeared without treatment."); *Pinto v. Rambosk*, No. 2:19-CV-551, 2021 WL

3406253, at *13 (M.D. Fla. Aug. 4, 2021) (finding no excessive force where the

plaintiff "never sought medical treatment for his hands, and there [was] no evidence

. . . of a lasting injury").

### a. D.L. has failed to show a clearly established right.

For the same reasons as previously discussed, D.L. has not met his burden of

showing that Deputy Smith violated a clearly established right against excessive

force. *See supra* Part (I)(A)(i)(c).

Unlike here, the plaintiffs in *Gray* and *Figueroa* were compliant and calm

when the SRO used force. *See Gray*, 458 F.3d at 1301–06; *Figueroa*, 721 F. Supp.

3d at 1297. The courts in both cases emphasized this fact, noting that "[t]he

problem in this case for [the officer] is that, at the time [he] handcuffed [the

plaintiff], there was no indication of a potential threat to anyone's safety . . . .  The incident was over, and [the plaintiff] . . . had promptly complied with her teachers' instructions. . . ."  *Gray*, 458 F.3d at 1306.  Likewise, the plaintiffs in *Figueroa* "remained calm and compliant" and "made no attempt to flee, hit, or resist. . . ."  *Figueroa*, 721 F. Supp. 3d at 1297–98.  The facts of these cases are significantly different from the facts of this case and, therefore, cannot demonstrate a clearly established right.

Moreover, D.L. cannot establish that Deputy Smith's conduct was unlawful under the "obvious clarity" test.  As previously explained, case law does not provide the necessary precedent to establish a broad principle that should have put Deputy Smith on notice that his conduct violated a constitutional right.  *See supra* Part (I)(A)(i)(c).

Thus, only if Deputy Smith's conduct was so egregious as to have blatantly violated the Constitution can D.L. show that qualified immunity is inapplicable.  *Lewis*, 561 F.3d at 1292.  This narrow exception requires Plaintiffs to "show that [the official's] conduct was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without case law on point."  *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997).  "This standard is met when *every* reasonable officer would conclude that the excessive force used was plainly unlawful."  *Lewis*, 561 F.3d at 1292 (emphasis added); *see Fuqua v. Turner*, 996 F.3d 1140, 1150 (11th Cir. 2021) ("We will not consider a right to be 'clearly established' unless its contours were sufficiently clear

31

that every reasonable officer would have understood that what he was doing
violates that right.") (emphasis added and citation omitted).

Precedent in this circuit "do[es] not indicate that handcuffing a resisting
[individual] is obviously unlawful.  In fact, [it] establish[es] the opposite.
Handcuffing is a *de minimis* use of force."  *Dorminey*, 2022 WL 17351654, at *6
(affirming the officer's entitlement to qualified immunity where the plaintiff
student "successfully resisted [the officer]'s wristlock two times" and the officer
"applied more force until he over-came [the plaintiff's] resistance," resulting in the
plaintiff's broken arm); *Sebastian*, 918 F.3d at 1308 ("We have applied the de
minimis force principle to handcuffing and granted officers qualified immunity in a
series of cases."); *see Lewis*, 561 F.3d at 1292 (holding that the officer was entitled to
qualified immunity where the officer's restraints resulted in the plaintiff's death
because the plaintiff "did not remain compliantly restrained" and, "[e]ven though he
was not forcefully attacking the officers, [the plaintiff] continued to struggle").

Accordingly, the Court finds that Deputy Smith is entitled to qualified
immunity as to D.L.'s excessive force claim.

## B. The Hernando County Sheriff's Office Did Not Violate the ADA.

Count II of D.L.'s Second Amended Complaint seeks compensatory damages
alleging that the HCSO violated Title II of the ADA and its implementing
regulations.  (Doc. 62 at ¶¶ 44–51) (citing 42 U.S.C. § 12132; 28 C.F.R. §
35.130(b)(3) and (8)).  Specifically, D.L. alleges that HCSO has violated the ADA
"[t]hrough its failure to adopt a policy and practice of providing reasonable

32

modifications to schoolchildren with disabilities[.]"  (*Id.* at ¶ 49).

Under Title II, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination

by any such entity."  42 U.S.C. § 12132.  The implementing regulations of Title II

provide that, "[a] public entity may not . . . utilize criteria or methods of

administration . . . [t]hat have the effect of subjecting qualified individuals with

disabilities to discrimination on the basis of disability" and "[a] public entity shall

not impose or apply eligibility criteria that screen out or tend to screen out an

individual with a disability. . . ."  28 C.F.R. § 35.130(b)(3), (8); *see Concerned Parents*

*to Save Dreher Park Ctr. v. City of W. Palm Beach*, 846 F. Supp. 986, 991 (S.D. Fla.

1994) ("Certainly intentional discrimination is banned by Title II. But further,

actions that have the *effect* of discriminating against individuals with disabilities

likewise violate the ADA.").

"To state a Title II claim under the ADA, a plaintiff generally must prove

(1) that he is a qualified individual with a disability; (2) that he was either excluded

from participation in or denied the benefits of a public entity's services, programs,

or activities, or was otherwise discriminated against by the public entity; and (3)

that the exclusion, denial of benefit, or discrimination was by reason of the

plaintiff's disability."  *Friedson v. Shoar*, 479 F. Supp. 3d 1255, 1263 (M.D. Fla.

2020) (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001)).

"Police conduct during an arrest of a disabled person is within the

parameters of the ADA so long as the plaintiff was 'subjected to discrimination.'"

*Id.* (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)).

"[T]he question is whether, given criminal activity and safety concerns, any

modification of police procedures is reasonable before the police physically arrest a

criminal suspect, secure the scene, and ensure that there is no threat to the public

or officer's safety." *Bircoll*, 480 F.3d at 1085. "The reasonable-modification inquiry

in Title II-ADA cases is a highly fact-specific inquiry." *Id.* (quotation omitted).

Ordinarily, ADA violations entitle a plaintiff only to injunctive relief.

*Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019). To get

compensatory damages, as D.L. seeks, he must also prove that the HCSO "engaged

in intentional discrimination, which requires a showing of 'deliberate indifference.'"

*Silberman*, 927 F.3d at 1134 (quoting *Liese v. Indian River Cty. Hosp. Dist.*, 701

F.3d 334, 348 (11th Cir. 2012)). "Deliberate indifference" is an "exacting standard"

that "requires proof that 'the defendant knew that harm to a federally protected

right was substantially likely and . . . failed to act on that likelihood.'" *Id.* (quoting

*J.S., III by & through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 987

(11th Cir. 2017) and *Liese*, 701 F.3d at 344). Further, D.L. must show that an

"'official who at a minimum has authority to address the alleged discrimination and

to institute corrective measures on the [entity's] behalf had 'actual knowledge of

discrimination in the [entity's] programs and fail[ed] adequately to respond.'" *Id.*

(quoting *Liese*, 701 F.3d at 349). This official "must be 'high enough up the chain-of-

command that his . . . acts constitute an official decision by the [entity] not to

34

remedy the misconduct.'" *Id.* (quoting *J.S., III by & through J.S. Jr.*, 877 F.3d at 992).

D.L. cannot prove deliberate indifference because he points to no high-up official at the HCSO *at all*—let alone one that knew of the entity's discrimination toward children with disabilities and did not sufficiently respond. D.L. repeatedly argues that the HCSO failed to "adopt[] any policy . . . as to the duty of SROs to provide reasonable accommodations and modifications under the ADA to school children with developmental disabilities," but does not provide allegations or evidence of *any* official at the HCSO who had a supervisory role over the ADA policy. (Doc. 144 at 34).[8] Despite bringing the ADA claim against the HCSO, D.L.'s entire response and motion focus on the actions of Deputy Smith. (Doc. 161; Doc. 144). But nothing in the record demonstrates that Deputy Smith qualifies as an "official" under the ADA. *Liese*, 701 F.3d at 350 (defining an "official" under the ADA as "someone who enjoys substantial supervisory authority within an organization's chain of command so that, when dealing with the complainant, the official had complete discretion at a 'key decision point' in the administrative process").

Though D.L. alleges that "Defendant [HCSO] and Sheriff Al Nienhuis . . . are

---

[8] It is the party's responsibility to point the Court to record evidence of its arguments. *Atlanta Gas Light Co. v. UGI Utilities, Inc.*, 463 F.3d 1201, 1208 n.11 (11th Cir. 2006) ("[T]he district court . . . has [no] obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention."); *Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record[.]"). Notwithstanding, the Court has reviewed the record and finds that D.L. has not presented evidence of any "official" at the HCSO.

charged with the responsibility of establishing policies, practices, and training for . .

. officers assigned to a public school," D.L.'s arguments and evidence on summary

judgment are completely devoid of any support for this allegation.  (Doc. 62 at ¶ 7);

*Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is

upon the parties to formulate arguments; grounds alleged in the complaint but not

relied upon in summary judgment are deemed abandoned.").

Thus, even when viewed in the light most favorable to D.L., he has not stated

a claim for compensatory damages under the ADA.  *See Silberman*, 927 F.3d at

1134–36 (holding that plaintiffs did not state a claim for compensatory damages

under the ADA because they could not point to an official with "substantial

supervisory authority" within the entity's "chain of command"); *see also Friedson*,

479 F. Supp. 3d at 1264 (denying summary judgment for plaintiffs where "nothing

in the record" demonstrated that any officer was an "official" with "substantial

supervisory authority").[9]

---

[9] Any failure to train claim made by D.L. also fails.  Count II of Plaintiff's Second Amended Complaint alleges that the HCSO violated the ADA by failing to accommodate.  (Doc. 62 at ¶ 51).  Yet, D.L. attempts to turn this into an additional claim for failure to train at the summary judgment posture.  (Doc. 144 at 34; Doc. 168 at 6–7; Doc. 161 at 21–24).  The case law and arguments D.L. relies on in support are irrelevant to the ADA; rather, they deal with failure to train under 42 U.S.C. § 1983—a statute not mentioned under Plaintiffs' Count II.  (Doc. 62 at 14–16; Doc. 161 at 22–23) (citing *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1397–98 (11th Cir. 1994) (analyzing a claim for failure to train under section 1983 and making no mention of Title II) and *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (considering a failure to train claim under section 1983, not Title II).  Therefore, the Court declines to consider a claim not pleaded.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").  In any event, to state a claim for compensatory damages under the ADA, a plaintiff must demonstrate deliberate indifference, which the Court has already established D.L. failed to show.

II.    **D.L.'s claims against HCSB fail**.

D.L. brings three claims against HCSB, including Title II claims for disability

discrimination and failure to accommodate, as well as a U.S.C. § 1983 claim for

failure to train Deputy Smith on Baker Act procedure.  (Doc. 62 at ¶¶ 76–126).  The

Court finds that none of the claims can survive summary judgment.

**A. HCSB did not violate the ADA**.

Counts III and IV of the Second Amended Complaint seek compensatory

damages against HCSB for violations of Title II under 42 U.S.C. § 12132 and 28

C.F.R. § 35.130(b)(3), (7), and (8).  (Doc. 62 at ¶¶ 76–126).  Count III alleges that

HCSB violated Title II because "school personnel (including the SRO) . . . act[ed] out

of animus or frustration" toward D.L.'s disability, thereby discriminating against

D.L. "on the basis of disability."  (Doc. 62 at ¶¶ 76–87).  Count IV alleges that HCSB

violated Title II by failing to accommodate D.L.'s disability.  (Doc. 62 at ¶¶ 88–126).

Neither claim succeeds.

There is no evidence that any school personnel acted with intentional

discrimination in handling D.L.'s behavior on January 10, 2018.  *Silberman*, 927

F.3d at 1134 ("To get [compensatory] damages . . . a plaintiff must . . . prove that

the entity that he has sued engaged in intentional discrimination, which requires a

showing of 'deliberate indifference.'") (quoting *Liese*, 701 F.3d at 348).  Indeed,

D.L.'s own expert witnesses testified that the school did *not* act with discriminatory

intent; rather, they were attempting to de-escalate D.L.'s behavior.  (Doc. 163-9 at

152–54; Doc. 163-15 at 61–63).  The evidence shows that school personnel acted not

because of D.L.'s disability but, instead, "due to his own aggressive or self-injurious behavior." *J.P.M. v. Palm Beach Cnty. Sch. Bd.*, 916 F. Supp. 2d 1314, 1321–22 (S.D. Fla. 2013) (finding no discrimination on the basis of plaintiff's disability where the plaintiff offered no evidence of the same and the record showed teachers restrained the plaintiff because of his violent behavior).

As to D.L.'s failure to accommodate claim, he points to several instances of purported deliberate indifference by HCSB. First, that the IEP, FBA, and BIP inadequately provided for reasonable accommodation. (Doc. 144; Doc. 161; Doc. 134-4 at 293–325). D.L. insists that HCSB knew that accommodations provided to D.L. in his FBA and BIP were inadequate because the existing accommodations "were inadequate and deficient." (Doc. 144 at 28–29). The only record evidence D.L. cites is testimony from Ms. DeArmas who stated that D.L.'s behavior was successfully de-escalated twenty-five percent of the time. (Doc. 161 at 19) (citing Doc. 136-2 at 151–52, 171–72). However, this is the estimated success rate for de-escalation only when Ms. DeArmas was involved. In any case, even when viewed in the light most favorable to D.L., this evidence does not demonstrate that HCSB *was aware* of an accommodation and *chose* not to provide it.

Next, D.L. argues that the existing IEP and BIP, which were updated less than a month prior to January 10, 2018, were ineffective in addressing behaviors such as throwing and hitting. (Doc. 161). These behaviors were addressed in the IEP and BIP. (*See* Doc. 134-4 at 302, 306–07). However inadequate D.L. argues the plans were, this does not rise to the level of deliberate indifference.

Last, D.L. attempts to establish deliberate indifference because he was not provided a communication mechanism during his behavioral outburst on January 10, 2018. (Doc. 144 at 29). But D.L. does not point to any evidence that HCSB knew that they should provide D.L. such an accommodation and made a deliberate choice not to provide it.

In each instance, D.L. fails to meet his burden of showing that HCSB was aware of accommodations that would mitigate D.L.'s behavior but made a deliberate choice not to provide those accommodations. *See McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1148 (11th Cir. 2014) (finding in favor of the defendant hospital where the plaintiff failed to present sufficient evidence that the hospital was aware an interpreter was required for the plaintiff but deliberately chose not to provide one).

Moreover, D.L. has not offered any evidence demonstrating that reasonable accommodations were requested that HCSB denied. *See Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492 (11th Cir. 2020) ("The plaintiff bears the burden of identifying a reasonable accommodation. . . ."). "[T]he duty to provide a reasonable accommodation is not triggered unless a *specific* demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999) (emphasis added); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997) ("[T]he ADA provides no cause of action for 'failure to investigate' possible accommodations. . . ."). Accordingly, D.L.'s unsupported allegation that HCSB "did not provide behavior interventions and supports as required" is

insufficient.  (Doc. 160 at 16).

**B.    HCSB did not make an unreasonable seizure of D.L.**

Count V of the Second Amended Complaint is a 42 U.S.C. § 1983 claim for
unreasonable seizure against HCSB.  (Doc. 62 at ¶¶ 102–26).  Specifically, D.L.
alleges that HCSB is liable for "failure to train SRO Smith."  (Doc. 160 at 6, 9).[10]

Where a plaintiff sues a local entity under 42 U.S.C. § 1983, the plaintiff
must show the injury occurred due to that entity's "policy or custom."  *Monell v.
Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Witsell v. Sch. Bd.
of Hillsborough Cnty., Fla.*, No. 8:11-CV-781-T-23, 2011 WL 2457877, at *2 (M.D.
Fla. June 20, 2011) ("Municipal liability arises only if the municipality maintains an
unconstitutional policy or custom.").

Under *Monell*, a plaintiff must establish "(1) that his constitutional rights
were violated; (2) that the municipality had a custom or policy that constituted
deliberate indifference to that constitutional right; and (3) that the policy or custom
caused the violation."  *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).
"[T]he custom or policy must be the 'moving force' behind the constitutional
deprivation for there to be sufficient causation."  *Marantes v. Miami-Dade Cnty.*,
649 F. App'x 665, 672 (11th Cir. 2016) (quoting *Monell*, 436 U.S. at 690–94).  "A
single incident [is] not . . . so pervasive as to be a custom . . . because a custom must
be . . . 'a longstanding and widespread practice. . . .'"  *Craig v. Floyd Cnty., Ga.*, 643
F.3d 1306, 1310 (11th Cir. 2011) (quoting *Brown v. City of Fort Lauderdale*, 923

---

[10] D.L.'s Motion for Summary Judgment does not address this argument other than to set
forth the standard for *Monell* violations generally.  (*See* Doc. 144 at 9–11).

F.2d 1474, 1481 (11th Cir. 1991)).  Thus, "[a] pattern of similar constitutional

violations . . . is ordinarily necessary."  *Craig*, 643 F.3d at 1310 (citation omitted).

As a preliminary matter, the Court acknowledges that HCSB cannot be held

liable for failing to train an SRO on Baker Act procedures.  D.L. relies on Florida

Statute § 1006.12(1)(b) to argue that Deputy Smith acted as school personnel and,

therefore, HCSB is liable for any illegal seizure due to D.L.'s involuntary

commitment.  (Doc. 144 at 20).  Under Florida's Baker Act statute, however, only

"[a] law enforcement officer may take a person who appears to meet the criteria for

involuntary examination into custody."  Fla. Stat. § 394.463(2)(a).  Indeed, D.L.

makes no argument that Deputy Smith was not acting as a law enforcement officer

when he decided to Baker Act D.L.  (*See* Doc. 161 at 9).  The record well establishes

that no school personnel had the authority to intervene in the involuntary

commitment.  (Doc. 144-7 at 69; Doc. 136-8 at 59; Doc. 136-4 at 182).  Accordingly,

any argument that school personnel "aided and abetted" in the Baker Act rings

hollow.  (Doc. 144 at 23–24).[11]

Even so, D.L. has not carried his burden of showing a pattern of similar

misconduct by HCSB because the only alleged instance of misconduct occurred on

January 10, 2018.  (*See generally* Doc. 62).  D.L. contends that if the need for more

---

[11] D.L.'s reply argues that HCSB has a duty to train SROs under Florida Statute §
1006.12(1)(c) (requiring SROs to "[c]omplete mental health crisis intervention training").
(Doc. 167 at 3).  Because D.L. makes this argument for the first time in his reply and this
statute appears nowhere in the Second Amended Complaint, the Court does not consider it.
*Gilmour*, 382 F.3d at 1315.  Notably, however, Deputy Smith did receive training specific to
dealing with minors in Baker Act situations.  (Doc. 136-7 at 16).  Even so, HCSB is not
liable for Deputy Smith's actions.

or different training is so obvious, and the inadequacy so likely to result in the

violation of constitutional rights, that the policymakers can reasonably be said to

have been deliberately indifferent to the need, then a single instance will suffice.

(Doc. 160 at 7) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)).

However, the *Canton* Court merely "*hypothesized* that, in a narrow range of

circumstances, a violation of federal rights may be a highly predictable consequence

of a failure [to train officers]." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*,

520 U.S. 397, 409 (1997) (emphasis added).  "[T]o date, the Supreme Court has

given only a *hypothetical* example of a need to train being 'so obvious' without prior

constitutional violations: the use of deadly force where firearms are provided to

police officers." *Gold v. City of Miami*, 151 F.3d 1346, 1352 (11th Cir. 1998)

(emphasis added).

In any event, the argument that Deputy Smith was not trained on the Baker

Act "falls far short of the kind of 'obvious' need for training that would support a

finding of deliberate indifference to constitutional rights on the part of the city."

*See Canton*, 489 U.S. at 396–97 (O'Connor, J., concurring) (holding that there was

no obvious need to train officers on mental illness diagnoses); *see also Young v. City

of Augusta, Ga. Through DeVaney*, 59 F.3d 1160, 1171–73 (11th Cir. 1995) (finding

no obvious need for law enforcement training on removal of mentally ill inmates

from the hospital).  This is especially true because Deputy Smith did receive

training on dealing with minor children during the Baker Act procedure.  (Doc. 136-

7 at 16).

Accordingly, the Court finds that HCSB is not liable under 42 U.S.C. § 1983 for unreasonable seizure of D.L.

## CONCLUSION

Accordingly, D.L.'s Motion for Summary Judgment (Doc. 144) is **DENIED** and HCSO's and HCSB's summary judgment motions (Doc. 134; Doc. 136) are **GRANTED**.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff, deny any pending motions as moot, terminate all deadlines, and close the case.

**ORDERED** in Tampa, Florida, on December 30, 2025.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE